STATE, FOR USE OF ALTORFER BROS. COMPANY, v. G. W.
DALRYMPLE, *d. b. a.* MINNESOTA STORAGE COMPANY,
AND ANOTHER.
WESTERN SURETY COMPANY, APPELLANT.[1]

February 4, 1949.

No. 34,821.

*George, Owen & Brehmer* and *C. Stanley McMahon,* for appellant.
*Sawyer & Gurnee* and *Miller, Westervelt, Johnson & Thomason,*
for respondent.

MATSON, JUSTICE.

Appeal by a surety company defendant from an order overruling
its separate demurrer to the complaint in an action against a public

[1]Reported in 35 N. W. (2d) 714.

warehouseman and his surety for the recovery of $8,977.50 alleged to be due as a balance on C.O.D. shipments made in behalf of plaintiff by the warehouseman from plaintiff's property held in storage.

The complaint alleges that the Altorfer Bros. Company (hereinafter called the plaintiff), for whose use and benefit the action herein is brought, is a manufacturer and seller of washing machines and ironers. The defendant G. W. Dalrymple (hereinafter called the warehouseman), doing business as the Minnesota Storage Company, operates a duly licensed public warehouse in the city of Winona. The other defendant, the bonding company, furnished the warehouseman a $10,000 surety bond as required by the statutes of this state. Plaintiff entered into a contract with the warehouseman whereby the latter agreed to store certain of plaintiff's washing machines, to ship the same on a C.O.D. basis for plaintiff, and to remit the proceeds of such C.O.D. shipments to plaintiff. The complaint further alleges that it is a part of the usual, ordinary, customary, and standard part of the business of a public warehouseman to make C.O.D. shipments for its customers and to remit the proceeds thereof to them. Of 372 washing machines received in storage, 370 were, pursuant to plaintiff's instructions, shipped by the warehouseman on a C.O.D. basis to plaintiff's customers for a total price of $22,871.25, all of which amount the warehouseman remitted to plaintiff except the sum of $8,977.50. It is alleged that the bonding company is liable to plaintiff for this unpaid balance under the terms of the bond. The bond, which was given in connection with the warehouseman's application "for a license to conduct the business of public warehouseman for the storage or warehousing of goods, wares, or merchandise other than grain and cold storage, for hire," provides in its operative portion as follows:

"* * * if said principal shall faithfully discharge all the duties of such warehouseman and shall fully comply with the laws of the State of Minnesota and the rules, regulations and orders of the [Railroad and Warehouse] Commission, relative thereto, and shall make good such loss or damage as may lawfully accrue, in the

conduct of said business, then this obligation shall be void, otherwise to remain in full force and effect."

In overruling the bonding company's demurrer to the complaint, the trial court certified that the question presented was important and doubtful.

■ Whether the complaint states a cause of action against the bonding company turns upon the question whether the duties of a public warehouseman are confined simply and strictly to the task of storing goods for profit—using the words "storage of goods, wares, and merchandise for hire" in a narrow sense—or whether the duties embrace the additional service of shipping and forwarding such goods, wares, and merchandise on a C.O.D. basis and collecting and remitting the proceeds therefor to the storage customers. In other words, is the bonding company only a surety against a breach of duty with respect to the limited function of receiving and storing goods for profit, or is it also a surety against its principal's failure to remit proceeds collected on a C.O.D. shipment?

The answer to this question must depend on an interpretation of applicable statutory provisions. In 1913, Minnesota adopted as c. 161, the uniform warehouse receipts act, which is now designated as M. S. A. c. 227. Two years later, in 1915, the legislature enacted c. 210 for the regulation of warehouses in cities and villages of more than 5,000 population, and this chapter is now known as M. S. A. c. 231. Both chapters contain definitions of a warehouseman. The earlier, or the uniform warehouse receipts act, provides (M. S. A. 227.58, subd. 1) that a " 'Warehouseman' means a person lawfully engaged in the business of storing goods for profit." The latter act, specifically § 231.01, subd. 5, defines a warehouseman as follows:

"The term 'warehouseman,' *as used in this chapter,* means and includes every corporation, * * * partnership, or individual, * * * controlling, operating, or managing in any city * * * having a population of 5,000 or more * * * directly or indirectly, any building or structure, or any part thereof, * * * and *using the same for the*

*storage or warehousing of goods, wares, or merchandise for hire,* * * *."* (Italics supplied.)

Which statutory definition governs is of some importance from the standpoint of its relation to other statutory sections which may serve to qualify its meaning. It stands admitted that the bond here involved was issued pursuant to the provisions of § 231.17, which requires that:

"Every warehouseman applying for and receiving a license * * * *as provided for in this chapter,* shall file with the commission, * * * a surety bond to the State of Minnesota. Such * * * bonds *to be conditioned for the faithful discharge of all duties as a warehouseman operating under this chapter, and full compliance with the laws of the state and rules, regulations, and orders of the commission relative thereto."* (Italics supplied.)

It is to be noted that the bond is restricted to warehousemen who apply for a license subject to c. 231, and that it shall be conditioned "for the faithful discharge of all duties as a warehouseman operating" under such chapter. The operative portion of the bond itself substantially follows the statutory language. Without question, the obligations assumed by the surety under the bond are controlled by § 231.17, which by its express terms is related to other sections of c. 231, inclusive of the definition contained in § 231.01, subd. 5. Immediately following subd. 5 is subd. 6, which specifically provides:

"The term *'service,'* as used in this chapter, *is used in its broadest sense* and *includes not only the use and occupancy of space for storage purposes,* but also any labor expended, and the use of any equipment, apparatus, and appliances or any drayage or other *facilities,* employed, furnished, or used in connection with the storage of goods, wares, and merchandise, subject to the provisions of this chapter." (Italics supplied.)

Clearly, the legislature by enacting § 231.01, subd. 6, intended to make certain that a warehouseman, for the purpose of the act, should unmistakably have duties and obligations that would go be-

yond those attendant upon the function of merely storing goods, wares, or merchandise for hire. This becomes clear when we turn to § 231.10, which outlines the duties of a warehouseman in the following language:

"All rates made, demanded, or received by any warehouseman for any *service* rendered or to be rendered shall be just and reasonable. * * *

"Every warehouseman licensed under this chapter *shall receive, store and forward* all property offered for storage by any person or corporation impartially and at as low a rate of charge and in a manner and on terms, and in quantities as favorable to the party offering such property as he at the same place receives, stores, and *forwards*, in the ordinary course of business, property of like description and in similar quantities offered by any other person or corporation." (Italics supplied.)

It is significant that the word "forward" is used in § 231.10 as descriptive of one of the "services" to be rendered by a warehouseman. It is obviously in recognition of the fact that the duty of forwarding merchandise has long and almost habitually been coupled with the business of storing merchandise for hire. As early as 1852, the supreme court of New York, in Bush v. Miller, 13 Barb. 481, 488, said:

"The important question in this case is, whether the defendant is liable in his character of warehouseman and forwarding merchant. 'Forwarding merchants,' says Justice Story in his treatise on bailments, § 444, 'are a class of persons well known in this country, and usually combine in their business the double character of warehousemen and agents, for a compensation to ship and forward goods to their destination. * * * Their liability is like that of warehousemen and common agents, * * *. A person who receives goods in his own store, standing upon his own wharf, for the purpose of forwarding them, is deemed but a mere warehouseman, * * *.' "

Again in 1858, in Place v. Union Express Co. 2 Hilt. (N. Y.) 19, 25, the court said:

"* * * A forwarder is one who, for a compensation, takes charge of goods entrusted or directed to him, and forwards them, that is, puts them on their way to their place of destination by the ordinary and usual means of conveyance, or according to the instruction he receives. Platt v. Hibbard, 7 Cow. 499; Ackley v. Kellogg, 8 Cow. 223; Brown v. Denison, 2 Wend. 593. *Where he has a warehouse for the reception and safe keeping of the goods until they can be forwarded, he unites the two-fold occupation of warehouseman and forwarder, which is the usual mode of conducting the business in this country.*" (Italics supplied.)

In other words, the warehouseman as a bailee may be, and normally as a practical business matter is, in a subordinate and incidental sense, an agent of his bailor for the purpose of forwarding merchandise to the bailor's customers. This function of forwarding merchandise to the bailor's customers would have little utility if the service did not include the collecting and remitting of the proceeds of C.O.D. shipments. As the trial court has observed, a statutory definition cannot be enlarged by usage or custom, but where the statutory definition is not clear as to the scope and meaning of its terms it becomes proper to examine the subject matter, the circumstances under which the legislation was enacted, the object to be attained, and the consequences of a particular interpretation. M. S. A. 645.16, subds. 2, 4, and 6. In so doing, the reasonableness of the intent ascribed to the legislature may be tested. It is to be presumed that the legislature did not intend a result that is absurd or unreasonable, but that it intended to bring about a practical result. § 645.17, subd. 1. In fact, the definition (§ 231.01, subd. 5) of a warehouseman as one who stores goods, *wares, or merchandise* for hire indicates that the legislature had in mind the forwarding function as it is related to normal commercial transactions. The terms "wares" and "merchandise" by their very meaning refer to articles normally forwarded in the stream of commerce.[2]

[2] We have not overlooked the definition of a "warehouseman" as used in State v. M. & St. L. R. Co. (1911) 115 Minn. 116, 131 N. W. 1075, and J. I. Case Co. v. Jansa (1934) 190 Minn. 518, 252 N. W. 436. The earlier

■ It follows that a surety executing a warehouseman's bond pursuant to § 231.17 is responsible for any loss resulting from a breach of duty on the part of its principal, the warehouseman, not only with respect to the actual function of storing goods, wares, or merchandise for profit, but also for a breach of duty in failing to remit the proceeds of C.O.D. shipments.

It has been urged that the foregoing rule is contrary to, and impairs the purpose of, the uniform warehouse receipts act (see c. 227). Although the legislature clearly may amend, or enact legislation in conflict with, the uniform warehouse receipts act, we find no fundamental conflict by reason of the interpretation herein adopted. The purpose of the uniform warehouse receipts act was to establish uniformity with respect to the title and the negotiability of warehouse receipts. The United States Supreme Court in Commercial Nat. Bank v. Canal-Louisiana B. & T. Co. 239 U. S. 520, 529, 36 S. Ct. 194, 197, 60 L. ed. 417, 422, Ann. Cas. 1917E, 25, pointed out that:

"* * * The cardinal principle of the Act—which has been adopted in many States—is to give effect, *within the limits stated,* to the mercantile view of *documents of title.*" (Italics supplied.)

It is difficult to understand how the imposition upon the warehouseman's surety of a responsibility for losses resulting from a breach of duty with respect to services which are ancillary to, and performed in connection with, the function of receiving and storing goods for profit impairs or in any way affects warehouse receipts as instruments of title.

Appellant has cited State ex rel. Cawrse v. American Surety Co. 148 Or. 1, 35 P. (2d) 487, and Republic Underwriters v. Tillamook Bay Fish Co. 133 Tex. 141, 126 S. W. (2d) 641, 121 A. L. R. 1152. In both cases, the liability of the surety for losses is limited to those

decision was rendered prior to the enactment of M. S. A. c. 231. In the latter case, no consideration was given to, and in fact there was no occasion for considering, c. 231, with its provisions for the regulation of the duties of a warehouseman.

which result only from a breach of duty with respect to a warehouseman's restricted function of receiving and storing goods for profit, on the theory that any other service rendered in connection therewith is not performed as a part of a warehouseman's duties, but pertains to an entirely different field such as that of a factor. Both Oregon and Texas have enacted a uniform warehouse receipts act, and each decision was based on the definition of a warehouseman as contained in that act. A careful reading of the decisions, however, reveals that no other controlling statutes similar to c. 231 were either involved or considered. We are, of course, in no position to ignore c. 231, a statute which was enacted subsequent to our adoption of the uniform warehouse receipts act and which clearly governs the duties of a warehouseman and the liability of his surety.

This case arose prior to the amendment of § 231.01 by L. 1947, c. 497, §§ 1, 2; therefore no consideration has been given to the statute as thus amended.

The order of the trial court is affirmed.

Affirmed.