TATE, Judge
(dissenting)'.
The scholarly majority opinion has well and correctly stated the facts. It has also set out well the law relating to the Uniform Warehouse Receipts Act, found at Chapter 1 of Title 54, Louisiana Revised Statutes (Sections 54:1-58); as well as the jurisprudence of certain other states regarding the sureties’ liability under the bonds there in question.
The majority’s fundamental error, however, consists in failing to perceive that the present suit does not involve any construction of the Uniform Warehouse Receipts Act. It further does not involve a surety bond with the more limited indemnifying agreement found in the bonds in the Oregon, Texas, and Idaho decisions relied upon.
What we are here concerned with is a Louisiana statute, enacted by.Act 218 of 1940 — more than three decades later than the Warehouse Receipts Act. The act we are concerned with is now found in the. Revised Statutes of Chapter 4 of Title 54 (Sections 241-260), and it is entitled “State Regulated Farmers’ Warehouse”.
Although the State Warehouse Commission also regulates the issuance of warehouse receipts, the function of the Louisiana warehouseman’s statute is broader. It is designed to regulate the licensing of the operation of agricultural products warehouses in the interest of protecting Louisiana farmers and of encouraging the development of Louisiana agriculture. Cf., LSA-R.S. 54:247.
The bond required of a warehouseman by this Louisiana statute (Chapter 4) is much broader, as we shall see, than merely protecting against defalcation in the issuance of warehouse receipts in accordance with Chapter 1, the Warehouse Receipts Act. However, before describing in more detail the statutory and bond provisions applicable to this casa, I think it well to recapitulate briefly the present facts.
I.
The three farmers in the present companion suits had delivered certain seed rice to the warehouseman for storing, with the agreement that the warehouseman was authorized to sell this seéd rice to buyers at the warehouse for a minimum net price per barrel ($7.25 Loewer, $7.50 Bieber), green weight.
It was specifically understood by the parties that the warehouseman could not sell this seed rice for less than the minimum price, without contacting the farmers. During the entire time the rice was stored in the warehouse, it remained the property of the farmers; they themselves could sell it or mortgage it directly, if they wished.
These plaintiff farmers were issued warehouse weight certificates, identifying their rice by lot and bin number. Their sacks were tagged with identifying numbers. On the books of the warehouse, it was shown as stored as their rice.
The record reveals that the farmers who stored rice in the present state-regulated warehouse customarily took these warehouse weight certificates, instead of a negotiable warehouse receipt, because normally the rice buyers purchased the rice at the warehouse where it was stored. A formal negotiable warehouse receipt was usually obtained only when a government price support loan was obtained on the rice.
The record further reveals that agreements such as the present farmers had with the warehousemen, were common in the agricultural community. The farmer stored his rice with the warehouseman and received a weight certificate therefor, and he *132 often authorized the warehouseman to accept offers to buy the rice for a certain minimum price. This was for the obvious purpose of permitting- the farmers to go about cultivating and harvesting their rice in the fields, without having to go back to town each time a- sale of part of their rice was made.
Under the custom of the community, this was simply part of the trust accepted by the warehouseman in storing the products for the farmers. As stated by one of the farmers, “A warehouse is where a farmer takes his rice to he sold”. Tr. 154. “The buyer comes in there and looks at it * * * and if he likes it, he buys it if the price is right”. Tr. 155.
We are here dealing with 1957 seed rice. Because the warehouseman defaulted in turning over the proceeds of the 1957 rice stored with him, we do not have as complete a picture of the arrangements between the parties as in the instance of the 1956 rice crop.
In that year, a similar arrangement was made between the present parties, storing the rice with the warehouseman and authorizing him to sell same at a minimum price of $7.00 per barrel dry-weight. At the end of the season, the remainder of the rice not sold directly from the warehouse was conveyed to a rice mill; the warehouseman then calculated and paid the farmers the gross receipts for the rice, and the farmers then paid the warehouseman for his storing, sacking, and drying charges, at this time that the mutual accounts between the parties were settled.
Under these circumstances, it seems to me that the trial court correctly concluded that the customary duties of the warehouseman included not only the storing of the goods for a profit (as defined under the Uniform Warehouse Receipts Act, Chapter 1 of Title 54, quoted by the majority; which statute, however, is not the enactment applicable to the present facts). Such duties also included his function of turning over to the farmers the proceeds from the buyers who purchased the farmers’ rice per the authorization given to the warehouseman at the time the rice was stored. The trial court correctly concluded that the defendant Duplechin “was, insofar as his dealings with the three plaintiffs are concerned, operating as a warehouseman”, so that therefore the defendant surety was liable under its bond.
Further, the facts indicate, at the very least, that the defendant Duplechin’s default in turning over the proceeds of the rice stored with him “arose out of” his duties as a warehouseman, even if technically not a breach of his duties “as” a warehouseman per se. As we shall shortly see, this distinction is material under the terms of the surety bond issued by the defendant insurer herein, a broader insuring protection than afforded by the more restricted surety bonds incorrectly relied upon by the majority.
It is appropriate now to discuss in more detail the legal sources upon which the majority incorrectly relied, in restricting the protection afforded to the present plaintiff farmers by the enactment designed by the legislature of Louisiana to afford farmers state-regulated “bonded” warehouses in which they could store their farm products. I may add, before discussing the law, that the record also reveals that the warehouse here in question was advertised as a “bonded warehouse”, and that the farmers in question relied upon this circumstance in dealing with the warehouseman here in question.
II.
In the first place, as I noted earlier, the majority fell into grave error, in my opinion, in regarding this to be a case in which the uniform interpretations of the Uniform Warehouse Receipts Act apply.
Thus, the majority’s reliance upon LSA— R.S. 54:57, providing for uniform interpretation of “this chapter” (i. e., Chapter 1, Sections 1-58 inclusive only, pertaining to “Warehouse Receipts”), is completely misplaced. For the present is a case arising *133 under another chapter (Chapter 4 of Title 54, Sections 241-260, pertaining to “State Regulated Farmers’ Warehouses”).
I may further add that the majority’s implication is unfounded that the present Louisiana farmers’ warehouse enactment is one of the uniform enactments. See Table 4, 1 Uniform Laws Annotated (1962) p. LI. The provisions of the Louisiana statute are individual as to this state, not a uniform enactment.
III.
What, then, does the Louisiana act require of a statutory bond issued to a warehouseman licensed by the state under the state-regulated farmers’ warehouse enactment, Chapter 4 of Title 54, LSA-R.S. 54:-241-54:260?
The relevant provision of LSA-R.S. 54:-250 is that “ * * * [t]he bond shall be conditioned on the faithful performance of duties and obligations to the patrons of the warehouse and of the provisions of this Chapter [i. e., not only the Warehouse Receipts Act] and the regulations prescribed by the commission.”
Likewise, what does the particular bond we are concerned with in this case provide ? (For the surety’s obligation is measured by the terms of the bond it issued herein, not by the terms of the bonds in the Idaho, Oregon, and Texas cases relied upon by the majority).
The insuring provisions of the bond (which are set forth in full as Appendix A to this opinion) provide that the condition of the bond is that the principal shall (1) “honestly conduct” the “business of a warehouseman of farm produce”, licensed by Louisiana as a state-regulated farmers’ warehouse; (2) “faithfully perform all duties and obligations to all parties doing business with said principal as a warehouseman” ; and (3) “pay all monies or accounts owed by it to * * * any person * * * whatsover arising otit of its conduct of such business of a warehouseman in farm produce.”
The bond here in question, and the statutory protection here afforded, are broader than in the instances of the foreign decisions relied upon by the majority opinion, which concerned bonds with a different wording, and also warehouses regulated by differing state statutes. See: Republic Underwriters v. Tillamook Bay Fish Co., 133 Tex. 141, 126 S.W.2d 641, 121 A.L.R. 1152 (1937); State ex rel. Cawrse v. American Surety Co. of New York, 148 Or. 1, 35 P. 2d 487 (1934); Jensen v. United States Fid. & Guar. Co., 78 Idaho 145, 298 P.2d 976 (1956) ; United States v. Fireman’s Fund Ins. Co., 191 F.Supp. 317 (N.D.Idaho, 1961) ; all cited in the majority opinion. See also Annotation, Public Warehouseman’s Bond, 121 A.L.R. 1155.
Succinctly, the liability under the bonds involved in those cases, was conditioned upon the warehouseman’s faithful performance of his duties as a public warehouseman (which the courts there in question felt did not include the function of apting as an honest agent in turning over to the farmers the purchase price collected for goods stored with the warehouseman). Some of these cases can also be distinguished in other respects also — for instance, the Cawrse decision strictly concerned the liability of a warehouseman in connection with the issuance of warehouse receipts under the Uniform Warehouse Receipts Law, a matter not at all at issue in the present proceedings.
In the case before us now, however, the obligation of the present bond was conditioned, not only on the faithful performance of all duties as a warehouseman, but also upon the “honest conduct” of said business, and, further, “upon the warehouseman’s payment of all monies or accounts owed by it * * * arising out of its conduct of such business as a warehouseman of farm produce.”
There is a distinction between the default in faithful performance of duties strictly as a warehouseman (which may sometimes be *134 limited to those duties pertaining to the storage of produce for a profit), as compared with the default in the broader range of duties "arising out of’ the conduct of such business. “Arising out of” connotes not only obligations within the technical scope of duties as a warehouseman; it connotes, additionally, other broader duties, causally connected with or originating from or growing out of the performance of the function of the insured’s capacity strictly as a warehouseman. See 4 Words and Phrases (Perm.Ed.), “Arising Out Of”, also 1963 Cumulative Pocket Parts.[1]
We must remember that we are here dealing with a bond issued by a compensated surety. It is well settled that, in Louisiana, the obligations set forth in a bond given by a compensated surety are strictly construed in favor of affording protection to the obli-gee in whose favor it is issued. Bickham v. Womack, 181 La. 837,160 So. 431; Victoria Lumber Co. v. Wells, 139 La. 500, 71 So. 781, L.R.A.1916E, 1110; Texas & Pac. Ry. Co. v. United States F. & G. Co., La.App. 2 Cir., 16 So.2d 671.
Applying the required construction in favor of affording protection to the obligees (the farmer-customers of the warehouseman), I think it plain that a warehouseman’s default in paying over the proceeds of agricultural products stored with him in his state regulated warehouse, “arose out of” the performance of such business as a ware *135 houseman, so as to be within the protection ágainst default afforded by the surety bond.' Moreover, according to the custom of the agricultural community, the function of collecting the sales price from the buyers of the produce stored with the warehouse for profit and also for the purposes of sale to the general public, were included among the mutually-agreed functions of the warehouseman.
IV.
And finally, it might be said, the law is not quite so uniform as the majority implies, on the question of the liability of the warehouseman’s surety in instances similar to the present.
See, e. g., Hartford Accident & Indem. Co. v. State of Kansas, 247 F.2d 315 (C.A. 10, 1957) (pointing out surety’s liability, under the Kansas warehouse act, for disposal of stored wheat- for which weight tickets were issued, as in the present case, rather than negotiable warehouse receipts; and also the importance of customary usage in determining the extent of the warehouseman’s duties); State for Use of Altorfer Bros. Co. v. Dalrymple, 227 Minn. 533, 35 N.W.2d 714 (1949) (where breach of customary duty of warehouseman to collect and remit proceeds for stored goods, was found to be a loss to the owner which was covered by the warehouseman’s bond, and where absence of conflict with Uniform Warehouse Receipts Act was noted) ; Indemnity Ins. Co. of North America v. Archibald, Tex.Civ.App., 299 S.W. 340 (1927) (which was later distinguished in the Tillamook Bay case cited by the majority, but which concerns the general, liability of a warehouseman’s surety in instances where a Uniform Warehouse Receipts Act does not apply) ; Lane v. Kasey, 1 Mete. (Ky.) 410 (1858), discussed at 121 A.L.R. 1158.
These cases concern liabilities under the bonds and statutes peculiar to them. They thus may be distinguished as applying to the present facts now before us — just as may the cases cited by the majority. We mention the decisions in question only in the interest of completeness, as well as to indicate that there is not quite the unanimity of holdings as the majority implies, in the sparse eight or ten decisions somewhat relating to the present questions that have arisen in all the American jurisdictions over the past one hundred years.
For the reasons assigned, therefore, the writer respectfully dissents.
APPENDIX “A”
Insuring Provisions of Present Bond:
“ * *’ * WHEREAS, in . accordance with the.terms and provisions of the Louisiana Revised Statutes of 1950, Title 54, Chapter 4 (Act 218 of 1940), the Principal has made application to the State Warehouse Commission-of the State of Louisiana for a license to engage in the business of a warehouseman of farm produce in the State, of Louisiana, and
. “WHEREAS, .the State Warehouse Commission of the State of Louisiana has approved said application.
“NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, that if the Principal shall honestly conduct said business, faithfully perform all duties and. obligations to all parties doing business' with said Principal as a warehouseman, and shall pay all monies or accounts owed by it to the State Warehouse Commission, any person, firm, exchange, corporation. or association whatsoever arising out of its conduct of such business of a warehouseman in farm produce, and otherwise conducts its - said business in accordance with the provisions of the Louisiana Revised'Statutes of 1950, Title 54, Chapter 4 (Act 218 of 1940), and the regulations issued th.ereunder then this obligation shall be null and void, otherwise to remain in full force and effect. * * * ”
On Application for Rehearing.
En Banc. Rehearing denied.
TATE, J., dissents. 'FRUGE believes a rehearing should be granted.

. For instance, at page 11 of the 1963 Cumulative Pocket Parts, 4 Words and Phrases (Perm.Ed.), the following annotations concern meanings assigned to the term “Arising Out Of": “Phrase ‘arising out of’ as used in automobile liability policy whereby insurer contracted to pay on behalf of insured all sums which insured should become legally obligated to pay for damages caused by accident and ‘arising out of’ ownership, maintenance or use of automobile or trailer meant causally connected with and not proximately caused by. Manufacturers Gas. Ins. Co. v. Goodville Mut. Cas. Co., 170 A.2d 571, 573, 403 Pa. 603. * * *
“An automobile liability policy covering injuries caused by accident and ‘arising out of’ ownership, maintenance or use of automobile and providing that use of automobile including the ‘loading and unloading’ thereof covered insured against liability which might be imposed upon insured by claimed negligence of insured’s truck driver in delivering sheetroek to cellar of insured’s customer who, some four hours after sheetroek had been delivered, was injured while standing near the sheetroek when it fell upon customer and injured her leg. American Auto. Ins. Co. v. Master Bldg. Supply & Lumber Co., D.C.Md., 179 F.Supp. 699, 704.
“Escrow instructions providing that bank should have right to commence or defend action to determine conflicting claims to money deposited in escrow and that parties to escrow should pay reasonable attorney’s fees incurred by bank in connection with ‘or arising out of’ the escrow, attorney’s fees were provided only in event of litigation contemplated therein such as arising out of conflicting demands made on the bank relative to terms of the escrow, funds, property or documents deposited therein, by an action by the bank for breach of the escrow or the bank’s suit in interpleader and where the gravamen of purchaser’s action against the bank was for fraud independent of the escrow instructions sounding in tort, it was not based upon or ‘arising out of’ the contract so as to entitle the successful bank to attorney’s fees. Francis v. Eisen-mayer, 340 P.2d 54, 57, 171 C.A.2d 221.

“Words ‘arising out of’ when used in connection with provision of policy covering property damage caused by accident arising out of use, operation or maintenance of motor vehicle are of broader significance than words ‘caused by’ and are ordinarily understood to mean originating from, incident to, or having connection with use of vehicle. Red Ball Motor Freight v. Employers Mut. Liability Ins. Co. of Wis., C.A.Tex. 189 F. 2d 374, 378. * * *
“Under workmen’s compensation statute, the words ‘out of’ point to the origin and cause of the accident or injury. Armstead v. Sommer, 131 N.E.2d 340, 342, 126 Ind.App. 273.
“Under exclusionary clause of property damage liability policy excluding coverage for injury or destruction of property arising out of collapse of or structural injury to any building, phrase ‘arising out of’ meant originating from, having its origin in, growing out of or flowing from. Minkov v. Reliance Ins. Co. of Philadelphia, 149 A.2d 260, 264, 265, 54 N.J.Super 509. * * * ”