## ST. PAUL INSURANCE COMPANIES v. FIREMAN'S FUND AMERICAN INSURANCE COMPANIES AND OTHERS.

245 N. W. 2d 209.

August 6, 1976—No. 45879.

*Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, O. C. Adamson II,* and *James F. Roegge,* for appellant.

*Fisher, Patterson, Sayler & Smith, C. Keith Sayler, Erickson, Zierke, Kuderer, Utermarck & McKenna,* and *Charles R. Zierke,* for respondent Fireman's Fund.

*Lindquist & Vennum* and *Harry C. Piper III,* for respondent Peavey Company.

*Gavin, Gavin & Olson* and *Michael M. Gavin,* for respondents Harold and Reuben Hoffman.

*Kunz & Mueller, A. R. Mueller, Edw. A. Nierengarten,* and *Randall E. T. Kroening,* for respondents Brey and Klinger.

Heard before Kelly, MacLaughlin, and Scott, JJ., and considered and decided by the court en banc.

MacLaughlin, Justice.

This is an interpleader action by St. Paul Fire and Marine Insurance Company (St. Paul) to determine its liability under three public local grain warehouseman's bonds issued to Lafayette Farm Services, Inc. (Lafayette). The trial court concluded that St. Paul was liable on the surety bonds and entered judgment in favor of the claimants. We affirm the conclusion that St. Paul is liable on the surety bonds but instruct the trial court to vacate judgment until the validity of other claims pending against the bonds is finally determined.

Public local grain warehouses are required to obtain and file a surety bond with the Minnesota Public Service Commission (PSC) in order to secure a license under Minn. St. 232.02. The PSC prescribes the amount of the surety bond based on monthly reports of the amount of grain stored in the warehouse. The bond is conditioned upon the "faithful performance by the public local grain warehouseman of all the provisions of law relating to the storage of grain by such warehouseman and the rules and regulations of the [PSC] relative thereto." Minn. St. 232.13. Pursuant to these requirements, Lafayette, a licensed public local grain warehouse located in Lafayette, Minnesota, acquired the following surety bonds from St. Paul: (1) For the period July 1, 1967, through June 30, 1968, a surety bond in the amount of $100,000; (2) for the period July 1, 1968, through June 30, 1969, a surety bond in the initial amount of $100,000, amended to $125,000 in December 1968 and to $140,000 in February 1969; and (3) for the period July 1, 1969, through June 30, 1970, a surety bond in the amount of $140,000.

On August 18, 1969, representatives of the Consumer Marketing Service (now known as the Agricultural Marketing Service) of the United States Department of Agriculture performed a routine examination of Lafayette. This examination revealed that Lafayette did not have sufficient grain in storage to satisfy its outstanding delivery obligations. Soon after this discovery Lafayette was closed and was ultimately placed in receivership

in October 1969. Numerous claims were made against the surety by various holders of storage receipts, and St. Paul commenced this interpleader action in the Nicollet County District Court to determine its liability under its bonds.

Fireman's Fund American Insurance Companies (Fireman's Fund) filed the largest claim against the surety. The factual basis for this claim is that on July 1, 1966, Lafayette entered into a Uniform Grain Storage Agreement (UGSA) with Commodity Credit Corporation (CCC). CCC is a Federal corporation which acquires grain under loan support programs throughout the country. One of the sections of the UGSA provided that CCC could secure a blanket insurance policy covering its grain in the Lafayette warehouse and that this policy would not inure to the benefit of Lafayette. The section further provided:

"* * * If the insurance company * * * providing blanket coverage to CCC pays any amounts to CCC for which the warehouseman is liable, such company shall, to the extent permitted by law, be subrogated to CCC's right of recovery against the warehouseman and any other person to the extent of such payment."

Pursuant to this provision CCC obtained blanket insurance coverage from Fireman's Fund which insured CCC for any loss up to $250,000 per warehouse arising out of a warehouseman's failure to abide by the terms of the UGSA or to perform any other of his obligations as a warehouseman. CCC's policy with Fireman's Fund also provided that Fireman's Fund be subrogated to the rights of CCC, and that Fireman's Fund was to be considered as a subinsurer or subsurety under the policy.

CCC was holding Lafayette storage receipts in excess of $176,-000 at the time it was discovered that Lafayette did not have sufficient grain to cover its obligations. CCC immediately issued load out orders for this grain, but Lafayette was unable to comply with these orders. CCC then filed a claim for its loss with Fireman's Fund, and that company ultimately paid CCC

$176,468 on the claim. Fireman's Fund now seeks to recover against the surety bond as a subrogee of CCC's rights.

At trial it was established that Lafayette was in a "short" position not only on August 18, 1969, but also during the two previous bonding periods.[1] In other words, Lafayette had not maintained sufficient grain to meet outstanding storage receipts during the bonding periods of July 1, 1967, to June 30, 1968, and July 1, 1968, to June 30, 1969. These "shortages" were not discovered during routine examinations because during these previous bonding periods Lafayette had concealed certain "storage receipts" that it had issued to Peavey Company and other terminal companies. The issuance and concealment of these receipts violated statutory provisions and PSC regulations. St. Paul alleges that the "storage receipts" held by Peavey Company and other terminal companies are invalid because they were fraudulently issued as a result of "financial transactions."[2] The validity of these storage receipts is currently being litigated in a case which is now pending before Judge Walter Mann in district court.

Other claims presented to the trial court in the interpleader action include the following:

*"Lee Hoffman,* storage receipt No. 519, for 2,371 bushels of yellow corn in the amount of $2,941.02.

*"Harold Hoffman,* scale tickets for 21,049 bushels of No. 2 yellow corn in the amount of $24,311.60. This grain was never stored at Lafayette but was trucked directly from the Hoffman farm to Peavey Company.

*"Reuben Hoffman,* scale tickets for 7,076 bushels of No. 2 yellow corn in the amount of $11,663.22. This grain was never

---

[1] Trial Court's findings of fact Nos. 14, 15, 16(2b), 16(4a).

[2] St. Paul contends that Lafayette entered into certain loan transactions with Peavey wherein Lafayette pledged storage receipts to Peavey in return for cash advances, and that at no time did Peavey deliver grain to Lafayette for storage.

stored at Lafayette but was trucked directly from the Hoffman farm to Peavey Company.

"*C. Merton Anderson,* NSF check in the amount of $2,757.53 for the sale of 653.5 bushels of soybeans to Lafayette and NSF check in the amount of $9,482.57 for the sale of 3,698.34 bushels of soybeans to Lafayette and 6,713.93 bushels of No. 2 yellow corn in the amount of $8,056.71. This grain was never stored at Lafayette but was shipped directly from the Anderson farm to Port Bunge terminal.

"*Jerome Klinger,* scale tickets for corn in the amount of $6,522.78.

"*Norbert Brey,* scale tickets for 900 bushels of corn in the amount of $1,027.00.

"*Herb Maidl,* scale tickets for 1,068.83 bushels of soybeans in the amount of $2,744.22.

"*Leo Maidl,* scale tickets for 366 bushels of oats in the amount of $440.13.

"*Victor Maidl,* scale tickets for 170.83 bushels of wheat in the amount of $264.79.

"*Alvin Blaalid,* scale tickets for 1,087.56 bushels of oats in the amount of $654.47.

"*Philip Zeise,* NSF check in the amount of $18,245.75 for 15,863.75 bushels of No. 2 yellow corn sold to Lafayette.

"*Robert Dittrich,* in the amount of $4,345.78 for trucking services rendered on behalf of Lafayette."

The trial court concluded that St. Paul was liable under all three bonds and entered judgment in favor of Fireman's Fund, Peavey Company, and those claimants holding either storage receipts or scale tickets.[3] St. Paul appeals from the trial court's order and judgment.

The issues raised on this appeal are:

(1) Whether Fireman's Fund is entitled to be subrogated

---

[3] *The trial court disallowed the claims of holders of NSF checks and the claim for trucking services. These claims are not involved in this appeal.*

to CCC's right of recovery against the warehouseman's bond;

(2) Whether St. Paul, the surety, is liable under previous bonds which were in effect at the times Lafayette was in default;

(3) Whether sellers of grain holding scale tickets may recover under a public local grain warehouseman's bond.

■ The Federal courts which have considered the rights and liabilities between the surety on a warehouseman's bond (such as St. Paul) and the surety for CCC grain deposited in that warehouse (such as Fireman's Fund) have adopted the position of Restatement, Security, § 146(c), summarized in Jorski Mill & Elev. Co. v. Farmers Elev. Mutual Ins. Co. 404 F. 2d 143, 147 (10 Cir. 1968), as follows:

"A surety may stipulate to be a supplemental or subsurety provided that it is under no duty to assume a greater liability and that its stipulation will not inequitably increase the obligation of another surety."

See, also, Millers Mutual Fire Ins. Co. of Texas v. Farmers Elev. Mutual Ins. Co. 408 F. 2d 776 (5 Cir. 1969); United States v. Horvath Brothers, Inc. 278 F. Supp. 159 (E. D. Wis. 1967). It is clear in the instant case that Fireman's Fund has stipulated to be a subsurety, that it was under no duty to assume a greater liability, and that its stipulation does not inequitably increase the obligations of another surety. Therefore, under the Restatement rule, Fireman's Fund is entitled to be a subsurety. First, it is undisputed that Fireman's Fund stipulated in its policy with CCC that its obligation under the policy was that of a subinsurer or subsurety.[4] The rule allowing an insurer to stipulate as a subsurety is not based on notions of contract but rather proceeds from equitable considerations.[5] At common law, sureties covering the same risk were presumed to agree that all would con-

[4] St. Paul's reliance on the decision in United States v. Horvath Brothers, Inc. 278 F. Supp. 159 (E. D. Wis. 1967) as being dispositive is misplaced since there was no express right of subrogation or stipulation of subsuretyship in Horvath as there is in the instant case.

[5] Restatement, Security, § 146(a), does provide, though, that "sureties may conclusively determine their relation by agreement."

tribute as cosureties to the common loss caused by the principal's default. This presumption is rebutted, however, when one of the sureties expressly stipulates that it does not agree to contribute as a cosurety. As stated in Stearns, Law of Suretyship (5 ed.) § 11.20:

"* * * If a mutual understanding between the surety and either the debtor or creditor be established that the liability of co-surety is not assumed, contribution will not be enforced, even though the earlier surety had no notice of the arrangement."

In the instant case Fireman's Fund had such a mutual understanding with both CCC, the creditor, through its blanket insurance policy, and with Lafayette, the debtor, through the UGSA. Consequently, the fact that St. Paul did not affirmatively assent to Fireman's Fund's stipulation is irrelevant and under the Restatement rule does not defeat Fireman's Fund's status as a subsurety.

Second, Fireman's Fund was under no duty to assume a greater liability than that of subsuretyship. Fireman's Fund's liability under its policy with CCC was not defined by statute. The scope and terms of Fireman's Fund's coverage was purely a matter of private contract between Fireman's Fund and CCC. In that contract Fireman's Fund bargained for and obtained its status as subsurety and its right of subrogation. It was under no statutory or contractual duty to assume any greater liability.

Finally, Fireman's Fund's stipulation to be subsurety did not inequitably increase the obligation of St. Paul. At the time CCC acquired Fireman's Fund's policy St. Paul was already bound to CCC on the warehouseman's bond, and Fireman's Fund had no existing duty to St. Paul. Thus, the issuance of the Fireman's Fund policy did not in any way increase St. Paul's obligations or exposure. Indeed, St. Paul's premiums on its bonds were not affected by the fact that CCC procured extra insurance. In contrast, Fireman's Fund's premiums were based on its policy provisions that it was a subsurety and would have the right of subrogation.

We conclude, therefore, that under the Restatement rule adopted by the Federal courts Fireman's Fund would be considered a subsurety on the facts in this case. It is apparent that CCC could have directly recovered against St. Paul for the loss occasioned by the default of Lafayette. We do not see why St. Paul should be insulated from such a recovery merely because CCC had the foresight to acquire additional insurance against the loss.

■ All three of St. Paul's bonds with Lafayette were conditioned upon the "faithful performance by the public local grain warehouseman of all the provisions of law relating to the storage of grain by such warehouseman and the rules and regulations of the [Public Service Commission] relative thereto." Minn. St. 232.13. The trial court found, and its findings are supported by the record, that Lafayette violated the conditions of its bonds by (1) issuing storage receipts for grain not actually received into its warehouse (Minn. St. 232.06, subd. 6); (2) failing to maintain in its warehouse at all times grain of proper grade and sufficient quantity to meet its delivery obligations (PSC Regulation 66[g]); (3) failing to furnish to the PSC an accurate monthly report of its inventory and obligations (PSC Regulation 66[d]); (4) failing to maintain proper records of all grain received, stored, shipped or delivered (PSC Regulation 66[e]). These violations occurred during the bonding period of July 1, 1967, to June 30, 1968, the bonding period of July 1, 1968, to June 30, 1969, and the bonding period of July 1, 1969, to June 30, 1970. The trial court concluded that St. Paul was liable on all three bonds even though the violations and losses caused by these violations were not discovered until August 18, 1969. St. Paul argues that it should not be held liable on all three bonds since the bond in effect at the time of the loss specifically provides that "the maximum aggregate liability of the surety shall not, in any event, exceed the sum of [$140,000]."

Whether St. Paul's liability may exceed $140,000 depends on whether these warehouseman bonds which are renewed each year

are viewed as a single *continuing* contract or as *separate* contracts. If viewed as a continuing contract which is kept in force by the payment of annual premiums, then the surety's liability under the entire contract is limited to its specified amount regardless of when the default occurred. On the other hand, if the bonds are viewed as a series of separate contracts, then the surety is liable on each bond up to its stated limit for defaults which occur during the period each is in force, regardless of when the loss is actually discovered.

Although jurisdictions vary in their interpretation of these types of fidelity bonds, many courts have concluded that each bond should be viewed as a separate undertaking by the surety to protect against the defaults of the principal which occur during that bonding period. See, generally, Annotation, 7 A. L. R. 2d 946. Thus, in United States v. American Surety Co. of New York, 172 F. 2d 135 (2 Cir. 1949) the court allowed an employer to recover from a surety the full amount of a loss attributable to a series of embezzlements by an employee which had occurred during previous bonding periods. The court allowed full recovery even though the amount recovered exceeded the maximum liability stated in the current bond. The court reasoned that the renewal premium "should provide equal coverage, without diminishing the coverage for undiscovered defalcations in the previous period." 172 F. 2d 138. See, also, Maryland Cas. Co. v. First Nat. Bank of Montgomery, 246 F. 892 (5 Cir. 1917), certiorari denied, 246 U. S. 670, 38 S. Ct. 345, 62 L. ed. 931 (1918).

Similarly, in Giese v. Engelhardt, 175 N. W. 2d 578 (N. D. 1970), the North Dakota Supreme Court held that a surety's liability under a statutory bond guaranteeing that a security dealer would comply with all provisions of the state securities act was not limited to the penal sum specified on the current bond. Rather, the court held the surety liable for the face amount of the bond in each of five separate annual periods in which violations occurred. The North Dakota court stated (175 N. W. 2d 587):

"On the precise point Chief Justice Baldwin said in Metropolitan Casualty Co. of New York v. Billings (1963), 150 Conn. 603, 192 A. 2d 541: 'The legislature could hardly have intended such inadequate protection for the public. When the statutory provisions requiring the posting of a bond by each applicant for a license * * *, making posting of a bond a condition precedent of the issuance of any license * * *, and making it necessary to renew annually any license issued * * * are read together, as they must be, the legislative intent that the bond carry an annually cumulative liability is obvious. Any other interpretation would defeat the purpose of this remedial legislation.' "

We conclude that the same reasoning applies in the instant case. The statutory purpose for each statutory warehouse bond is to protect, up to its stated limits, the public from sustaining a loss because of the defaults of the warehouseman which occur during that bonding period.[6] This protection should not be destroyed merely because the warehouseman's defaults were not discovered until after that bonding period.[7]

St. Paul also argues that it should not be held liable on all three bonds because the bonds only protect "against loss during the period" and there was no loss during the bonding periods of July 1, 1967, to June 30, 1968, and July 1, 1968, to June 30, 1969, because Lafayette satisfied all demands for grain made upon it during those periods. This same argument was rejected by the United States Court of Appeals for the Tenth Circuit in General

---

[6] Minn. St. 232.02, subd. 4, states that the warehouse surety bond "shall be for the purpose of protecting any person dealing with the licensee * * * from loss by reason of any violation of this section."

[7] The same conclusion was reached in General Ins. Co. of America v. Commodity Credit Corp. 430 F. 2d 916 (10 Cir. 1970), where the Court of Appeals directly held that a surety on a statutory warehouseman bond, in addition to being liable under its current bond, was also liable under a previous bond for a violation which occurred while that bond was in effect.

Ins. Co. of America v. Commodity Credit Corp. 430 F. 2d 916, 918 (10 Cir. 1970):

"We believe that in such circumstances the liability of the warehouseman and his surety is keyed to the statutes and the agreement rather than to the elements of the common law tort of conversion. The statute was violated, the agreement was breached, and the obligation of the bond was broken. These facts created a cause of action on Bond A without regard to the law of conversion."

The court distinguished the decisions in Hartford Acc. & Ind. Co. v. State of Kansas, 247 F. 2d 315 (10 Cir. 1957), and Millers Mutual Fire Ins. Co. of Texas v. Farmers Elev. Mutual Ins. Co. 408 F. 2d 776 (5 Cir. 1969), upon which St. Paul relies as establishing a contrary rule. After distinguishing Hartford on its facts, the court stated (430 F. 2d 918):

"* * * The dicta in the Hartford decision, upon which the surety relies, is not controlling in the case at bar.

"The decision in Millers Mutual Fire Insurance Company of Texas v. Farmers Elevator Mutual Insurance Company, 5 Cir., 408 F. 2d 776, is not contrary to the result which we reach. There a pre-existing shortage had been corrected on the effective date of the bond and insurance policy in controversy. Here the shortage began under Bond A and continued through the remainder of the term of that bond and all of the term of Bond B."

The court then concluded (430 F. 2d 918):

"* * * The fact is that CCC did not recover the full amount of its quantity loss from Bond B. In our opinion CCC is entitled to payment under Bond A of the unrecovered balance."

We fully agree with the court's reasoning in General Insurance. Therefore, we hold that St. Paul is liable under its previous bonds for the defaults of its principal.

We also conclude that St. Paul's liability under its previous bonds is not contingent upon the validity of Peavey's storage re-

ceipts. Minn. St. 232.02, subd. 4, requires the surety on the warehouseman's bond to protect or indemnify against "loss by reason of any violation" of the statute or regulations. The warehouseman in this case unquestionably violated the statute and regulations during the 1967-1968 bonding period and the 1968-1969 bonding period. The fact that Peavey allegedly may also have committed some wrongdoing in its transactions with Lafayette does not alter the fact that St. Paul's principal violated the conditions of its bond. The trial court found that Lafayette's violations during these bonding periods caused the losses in the instant case. After reviewing the record we cannot say that this finding is clearly erroneous. Therefore, St. Paul, the surety, is liable for the violations of its principal during those previous bonding periods either to the extent necessary to make good the loss, or up to the limits stated on the bonds—whichever is less.

Whether Peavey may recover against the bond must, of course, depend upon the validity of its storage receipts. As noted earlier, the validity of Peavey's storage receipts is currently being litigated in district court. Although the trial court in the instant case ordered judgment in favor of Peavey in the amount of $84,250.55, judgment cannot be ordered with respect to this claim until it is determined that Peavey's storage receipts are in fact valid.

■ St. Paul also challenges the trial court's conclusion that sellers of grain may recover under a public local grain warehouseman's bond. The statute in effect at the time the loss in the instant case arose provided in part (Minn. St. 1967, § 232.13):

"* * * Such bonds shall run to the state of Minnesota for the benefit of all persons storing grain in such warehouse."

This statute was subsequently amended (L. 1969, c. 856, § 2), effective July 1, 1970, to provide in part:

"* * * Such bonds shall run to the state of Minnesota for the benefit of all persons storing grain in such warehouse, *or selling grain to such warehouseman.*"

St. Paul argues that by enacting this amendment, the legislature implicitly recognized that coverage under these bonds prior to the amendment was limited only to storers of grain.

We conclude, however, that the 1970 amendment was a clarification, rather than an expansion, of the surety's liability under the bond. We note that in 1967 the legislature combined the public local warehouseman's license to buy grain and the license to store grain into a single license. L. 1967, c. 318, § 4. After these licenses were combined, a warehouseman was required to have only one bond. It is only logical that the legislature intended the bond's protection to be coextensive with the operations licensed. Indeed, Minn. St. 232.02, subd. 4, which was in effect at the time of this loss, states:

"The surety bond shall be for the purpose of protecting any person dealing with the licensee * * * from loss by reason of any violation of this section."

This court has liberally construed these surety bonds in order that they accomplish their statutory purpose of protecting persons who deal with a publicly licensed warehouseman in normal and usual transactions from sustaining loss because of the warehouseman's defaults. State, For Use of Altorfer Bros. Co. v. Dalrymple, 227 Minn. 533, 35 N. W. 2d 714 (1949). A seller of grain places the same reliance on the warehouseman's faithful performance of its duties as does a storer of grain. If the warehouseman defaults in its duties, we see no logical reason for excluding the seller from the protection of the bond.

In sum, then, we hold (1) that Fireman's Fund is entitled to be subrogated to CCC's right of recovery against the bond; (2) that St. Paul is liable under previous bonds for the defaults of its principal which occurred while these bonds were in effect; and (3) that sellers of grain are entitled to recover against the bond.

We therefore remand this matter to the trial court with instructions (1) to vacate judgment in this action, and (2) to order

judgment consistent with this opinion at such time as the validity of all pending claims against the bonds has finally been determined.[8] At such time the trial court shall determine whether the total amount of the claims exceeds the proceeds of the bonds, and if so, make appropriate determinations as to the priority or proration of these claims.

Affirmed in part and remanded.

MR. CHIEF JUSTICE SHERAN and MR. JUSTICE OTIS took no part in the consideration or decision of this case.

---

[8] In addition to the uncertain validity of Peavey's claim, we have been informed that 36 additional claimants have initiated suit against the bond. Therefore, there should be no final entry of judgment in favor of any claimant until the validity and amount of all outstanding claims have been determined.