**UNITED STATES of America,
Appellant,**

v.

**EMPLOYERS MUTUAL CASUALTY
COMPANY, Appellee.**

No. 15372.

United States Court of Appeals
Eighth Circuit.

Nov. 2, 1955.

Robert S. Green, Atty., Department of Justice, Washington, D. C. (Geo. S. Leonard, Acting Asst. Atty. Gen., Francis E. Van Alstine, U. S. Atty., Sioux City, Iowa, and Melvin Richter, Atty., Dept. of Justice, Washington, D. C., were with him on the brief), for appellant.

D. J. Fairgrave, Des Moines, Iowa, for appellee.

Before WOODROUGH, VOGEL and STONE, Circuit Judges.

WOODROUGH, Circuit Judge.

This appeal arises out of an action by the United States to recover damages for spoilage and conversion of corn stored with Burt Grain Company, a licensed warehousing firm under the laws of Iowa, operated by C. L. and W. R. Burt as copartners.

As a condition of its licensing, Burt Grain Company had obtained a warehouseman's bond, under which appellee, as surety, assumed liability for damages growing out of the operation of Burt Grain Company's warehouses. This bond was executed on October 25, 1949, and carried a penalty of $34,000; an endorsement of September 21, 1950, increased the total penalty to $55,000. Commencing in December, 1948, Commodity Credit Corporation entered into a series of Uniform Grain Storage Agreements with Burt Grain Company, under which the warehouseman was obligated to store and preserve corn in accordance with the Corporation's directions, and issue warehouse receipts for all grain so received. The contract provided that the warehouseman should receive, store, condition, load out and ship grain stored with him "as requested by the owner or other authorized person or agency and in accordance with the provisions of this agreement * * *." Paragraph 7 of the contract required that with respect to commingled grain "the warehouseman shall at all times maintain in the warehouse indicated on the warehouse receipts and in which the grain was originally deposited for storage a stock of grain of the quantity, class, grade, and quality which he is obligated to deliver under the warehouse receipts."[1] In providing for termination in the event of the warehouseman's default, the contract stated that time is of the essence with respect to the warehouseman's failure to load out any grain in accordance with the terms of the agreement.[2] Between June 1, 1949, and December 19, 1951, there was deposited with Burt Grain Company for storage for the account of the Corporation some 450,000 bushels of yellow corn, upon which the warehouseman duly issued warehouse receipts to the Corpo-

---

[1]. With respect to grain stored identity-preserved, the contract provided that "the warehouseman shall at all times maintain the identical grain in the warehouse indicated in the warehouse receipt".

[2]. Paragraph 22 provides as follows—
22. Termination—Default—In the event of the failure of the warehouseman to load out any grain in accordance with the terms of this agreement, time being of the essence of this provision, Commodity shall have the right, unless such failure is ex-cused by law, to terminate this agreement with respect to any or all of the warehouses covered hereby, and, in the event either of the parties hereto shall default in the performance of any other provision herein, the other party if such default is not cured within fifteen (15) days after a written notice is mailed to the party in default, shall have the right to terminate this agreement with respect to the warehouse or warehouses involved without thereby being deprived of any claim for damage on account of such default.

ration. About December, 1951, the Corporation became aware that there were serious quantity and quality shortages in the stored grain, and from January 3, 1952, to February 20, 1952, it demanded by surrender of warehouse receipts and by issuance of seven loading orders the delivery of all the stored corn. The two principal loading orders were dated January 3, and January 4, 1952. Both demanded delivery "immediately" of stored grain, and both stated dates on which Commodity Credit Corporation would cease to pay storage charges on the grain. The first, demanding 118,-589.63 bushels of grain stored in Burt Grain Company's Galt, Iowa warehouse, set a stop-storage date of February 7, 1952. The second, demanding 314,908.50 bushels stored at the Company's Clarion, Iowa warehouse, had a stop-storage date of February 14, 1952. Burt Grain Company commenced loading out grain on January 21, 1952, but by February 14, 1952, the stop-storage date of the second loading order, the Company had delivered only some 50,000 bushels of corn. Moreover, all of this grain was inferior in grade to that stored by the Commodity Credit Corporation, and all of it was weevily, musty or sour. And by September 17, 1952, when shipments finally ceased, Burt Grain Company had shipped only some 300,000 bushels of yellow corn, all of which was of grade and quality inferior to that stored with it, and the greater portion of which was weevily, musty or sour. The difference in value between this low quality corn and the equivalent quantity of high grade corn stored with the Burt Grain Company amounted to $99,507.54. In addition, the value of the remaining 150,000 bushels of corn which the warehouseman failed to deliver at all amounted to $283,745.83.

Following investigations of the warehouseman's financial affairs, the Iowa State Commerce Commission revoked its warehouse license of the Burt Grain Company, advising appellee of this action on April 4, 1952. At about the same time, a federal indictment was returned against Clyde L. Burt for criminal con-version, and on October 14, 1952, he was sentenced to two years' imprisonment. Investigations were continued and although the full extent of the Commodity Credit Corporation's loss was not determined until the spring of 1953, on October 2, 1952, the Regional Attorney for the Department of Agriculture sent to appellee the following registered letter in regard to Burt Grain Company:

"The above company, upon whose bond you are surety, is short more than 140,000 bushels of corn which it had in store for Commodity Credit Corporation. In addition, the corn which was delivered was deteriorated and not of the grade or quality represented by receipts which Commodity Credit Corporation held. The company has indicated its inability to pay the amount due Commodity Credit Corporation and C. L. Burt, the managing partner, has been indicted for such conversions. Audits of the books of the company indicate that it has at all times been short more than 49,000 bushels of corn since March 31, 1952.

"Since the defaults of the company under its contracts with Commodity Credit Corporation and under its statutory duties as a warehouseman under the Iowa law are far in excess of the amount of your bond, demand is hereby made upon you for the payment to the Government of the principal amount of your bond of $55,000, together with interest at the statutory rate since March 31, 1952. Your check should be made payable to the Treasurer of the United States and mailed to this office."

Appellee did not comply with this demand, and on May 14, 1953, after the audit of the Burt Grain Company had disclosed the full extent of the default, the Government commenced this action seeking judgment against the Burts and the Burt Grain Company for the full amount of the losses and against appellee for $55,000, the total penalty on the bond. Interest was demanded on all claims

898

from January 2, 1952. On June 22, 1953, default judgment was entered against the Burts and Burt Grain Company for $427,235.06. This sum included the quantity and quality losses of the stored corn, refunds to the Corporation of storage charges paid on the converted corn, and interest at 5% (the statutory rate in Iowa, I.C.A. § 535.2) on the total of these claims from January 2, 1952.

Appellee, however, continued to contest its liability, putting the Government to proof and in addition raising a number of defenses.[3] The case stood at issue until it was ordered for pretrial conference, held on October 7, 1954. On October 5, 1954, the Government filed requests for admissions, to which appellee replied on October 19, 1954, admitting the genuineness of the Government's storage contracts and the amounts of damages claimed against the Burts, and that the damages were unpaid. Appellee filed demand for jury trial and the cause was assigned for trial beginning February 14, 1955. By interrogatory, the Government secured from appellee prior to trial an admission that it had no evidence in controversion of the Government's pleaded facts. The United States thereupon filed a motion for summary judgment, which was set for hearing on February 10, 1955. On that date, the Government's motion was sustained and judgment awarded against appellee for $55,-000, the penalty on the bond. The district court, however, contrary to the Government's demand, awarded interest on this sum only from October 7, 1954, and it is from the court's determination with respect to interest that the Government now appeals.

The Government contends for reversal that the district court erred in awarding interest to the Government from October 7, 1954, rather than from the date of the surety's default, and that the United States was entitled as a matter of right to interest from the date of the appellee's default. Its claim is that the date of default was February 14, 1952.

The appellee's position in support of the award of interest upon the amount of the judgment made by the district court is that the interest was recoverable only in response to considerations of fairness and that the measure of the interest that was to be awarded was discretionary with the court and that there was no abuse of discretion.

As we view it the question of the interest that should have been awarded to the Government on its judgment upon the warehouseman's bond in this case is ruled by the decision of the Supreme Court in Royal Indemnity Co. v. United States, 313 U.S. 289, 61 S.Ct. 995, 85 L. Ed. 1361, and the decisions that have followed and applied that case. U. S. v. Abrams, 6 Cir., 197 F.2d 803; U. S. v. Wissahickon, 2 Cir., 200 F.2d 936; Reconstruction Finance Corp. v. Service Pipe Line Co., 10 Cir., 206 F.2d 814; U. S. v. Edward Valves Co., Inc., 7 Cir., 207 F.2d 329; Ring Const. Co. v. U. S., 8 Cir., 209 F.2d 668.

In the Royal Indemnity case the Government sued the surety on a bond that had been given to a Collector of Internal Revenue to secure suspension of collection of a tax pending a claim for abatement. Abatement was allowed in part, but rejected as to $8223.38 on which interest had then accrued in the sum of $4169.07. The surety paid the principal amount of the tax by draft bearing the notation that it was in full payment of the tax and of all liability on the bond. The Collector collected the draft and surrendered the bond to the surety with the statement that all liability on it had been terminated.

Thereafter the Government brought suit against the surety claiming the Collector had been without authority to release the bond and that the surety had become and remained liable for the amount of the tax and interest. The district court found for the Government but

---

3. On motion of the Government, two of these defenses were later stricken by the court.

awarded it recovery only for the interest which the surety had failed to pay. It denied interest to the Government on the amount which the Government recovered on the bond. It regarded the Government's claim as a claim for interest upon interest. The Court of Appeals for the Second Circuit reversed as to the interest and directed interest to be added to the amount of the recovery on the bond. U. S. v. Royal Indemnity Co., 116 F.2d 247. On review of the case in the Supreme Court, the court declared that the obligation of the surety was contractual to pay an amount found to be due from the taxpayer, and the suit against it was for a debt ex contractu, due and owing in conformity to the terms of the bond and that it was for the Federal Courts to determine the appropriate measure of damage in terms of interest for nonpayment of the amount found to be due.

■ The court stated, [313 U.S. 289, 61 S.Ct. 997] "A suit upon a contractual obligation to pay money at a fixed or ascertainable time is a suit to recover damage for its breach, including both the principal amount and interest by way of damage for delay in payment of the principal after the due date."

The Supreme Court held as to the case before it, that:

"The present suit is at law for the recovery of an amount due and owing which petitioner had contracted to pay. To such a case, equitable rules relating to interest recoverable in suits for an accounting, or for recovery on quasi contractual obligations arising from payment of money by mistake, are inapplicable. * * * Here responsibility for delay in payment rests quite as much upon the debtor, who is chargeable with knowledge of his own obligation and the breach of it, as upon the creditor. And in the meantime the debtor has had the use of the money, of which its default has deprived the creditor. Interest upon the principal sum from the date of default, at a fair rate, is therefore an appropriate measure of damage for the delay in payment."

The judgment of the Court of Appeals was affirmed.

■ So in the case at bar the surety's obligation was contractual to pay upon default of its principal up to the amount of $55,000. The trial court has found that amount was due from the surety to the Government. It was a small part of the debt the warehousemen for whom the casualty company was surety incurred at the time they defaulted on their warehouse contract. Thus the suit against the surety here is for a debt ex contractu, due and owing in conformity with the terms of the bond. The Government's suit upon the contractual obligation to pay is a suit to recover damage for the breach including both the principal amount and interest by way of damage for delay in payment of the principal as settled in the Royal Indemnity case.

It is argued for the surety that the exact amount of the warehouseman's defalcation was not finally determined in this case until long after they had made default by failing to deliver the Government's grain on demand in February of 1952, and therefore the surety could not be charged with interest before the Government sued.

■ Substantially the same contention was made for the surety in the Royal Indemnity case. It does not appear to have been contended in that case that the collector or the surety acted corruptly in excluding interest from the first settlement of the bond liability and the action subsequently brought apparently presented genuine contest as to whether the interest was chargeable against the surety. But as quoted above, the Supreme Court considered the surety to be chargeable with knowledge of its own obligation and the breach of it and as the court further observed, "in the meantime the debtor has had the use of the money, of which its default has deprived the creditor. Interest upon the principal sum from the date of default, at a fair

**900**

rate, is therefore an appropriate measure of damage for the delay in payment."

 It is also contended here that the Government did not bring its suit against the surety for some time after February, 1952, and interest was not chargeable in the interim.

But the suit was brought well within the period of the statute of limitations, I.C.A. § 614.1, subd. 5. Through the whole period after the warehousemen's default, the Government was endeavoring to minimize the loss. It received and applied inferior grain and made some collections in other ways but it did nothing to excuse the surety in delaying or failing to pay its debt. The collections never brought the amount of the Government's loss down to $55,000 or close to that amount. The surety at all times remained obligated as it was in February, 1952, for the full sum for which it had bound itself.

It not only failed to pay upon the default of its principal but it interposed defenses to the Government's action against it. It could not support any of the defenses. The complaint against it was true and it was sustained. The surety had the use of the money due to the Government and kept the Government out of the use of it after as well as before the Government sued. It may not be held that the longer the lawsuit remained in court, the longer the surety was relieved from payment of interest. The judgment settled that the compensated surety here was obligated at all times after default of its principal for the payment of the full amount of $55,-000 and having failed to perform its obligation and make payment of the amount, it was chargeable with interest for the full period during which it withheld payment. The court erred in failing to include interest in its judgment from the date of default on February 14, 1952.

The judgment as to interest is therefore reversed and the case is remanded with direction to include interest in the judgment at 5 percent per annum from February 14, 1952.