**IT IS HEREBY ORDERED** that defendant's motion to dismiss or to strike is **granted** in part and **denied** in part.

**IT IS FURTHER ORDERED** that paragraphs 5 through 13 as incorporated by reference in Count I are stricken from the complaint.

**IT IS FURTHER ORDERED** that paragraphs 5 through 25 as incorporated by reference in Count IV are stricken from the complaint.

**IT IS FURTHER ORDERED** that the motion to dismiss Count III is **granted.** Plaintiff may file an amended complaint to include a claim for relief based on 42 U.S.C. § 1981a within ten (10) days of the date of this Order.

**APPLEY BROTHERS, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**UNITED STATES of America, Plaintiff,**

v.

**TRANSAMERICA INSURANCE CO., Defendant.**

**Nos. CIV 92–4110, CIV 92–4037.**

United States District Court,
D. South Dakota,
Southern Division.

April 11, 1996.

John J. Ulrich, U.S. Attorney's Office, Sioux Falls, SD, Peter Bonner, International Affairs, Department of Agriculture, Office of General Counsel, Washington, DC, for Plaintiff United States of America in No. CIV 92–4110.

James M. Cremer, Bantz, Gosch, Cremer, Peterson & Sommers, Aberdeen, SD, for Defendant Transamerica Insurance.

Jonathan K. VanPatten, USD School of Law, Vermillion, SD, for Plaintiff Appley Brothers, et al.

Glenn L. Roth, Freeman, SD, for Plaintiff Kaylor Grain Co., Inc.

James M. Cremer, Bantz, Gosch, Cremer, Peterson & Sommers, Aberdeen, SD, for Plaintiff Transamerica Insurance.

John J. Ulrich, U.S. Attorney's Office, Sioux Falls, SD, Bertha R. Mitrani, U.S. Dept. of Justice, Torts Branch, Civil Division, Washington, DC, Peter Bonner, International Affairs, Department of Agriculture, Office of General Counsel, Washington, DC, for Defendant United States of America in No. CIV 92–4037.

## MEMORANDUM OPINION AND ORDER

PIERSOL, District Judge.

The United States brings this action against Transamerica Insurance Company, CIV 92–4110, to collect on three Warehouseman's Bonds issued on behalf of Bird Grain Elevator in favor of the United States. Before the Court for ruling are the parties' cross-motions for summary judgment. The Court grants summary judgment for the United States and denies Transamerica's motion.

The facts essentially are undisputed. Transamerica admits the government's "Statement of Material Facts Not In Dispute," with one exception, and as will be shown later, Transamerica has produced insufficient evidence on that point to preclude entry of summary judgment for the government. Transamerica concedes that it is liable to the United States under the Warehouseman's Bond issued effective September 23, 1987, so what remains at issue is Transamerica's liability under the 1986 and 1988 bonds.

Bird Grain was a federally-licensed elevator engaged in the purchase, storage, and sale of soybeans, oats, corn, and other grains. Dennis Bird served as the elevator's president and general manager, and he was responsible for the day-to-day operation of the elevator. Under the United States Warehouse Act, Bird was required to execute and file with the Secretary of Agriculture a sufficient bond to the United States to secure the faithful performance of his obligations as a warehouseman under federal statutes and regulations and of "such additional obligations as a warehouseman as may be assumed by him under contracts with the respective depositors of agricultural products in such warehouse." 7 U.S.C. § 247. The parties agree that, under the Warehouse Act, Bird was required to maintain at all times sufficient inventory of the requisite quality grain to meet all storage obligations on demand.

Pursuant to the Warehouse Act and its regulations, Bird Grain purchased from Transamerica on September 4, 1986, Warehouseman's Bond No. 5365 58 30, in the penal sum of $209,000, to take effect September 23, 1986. (Doc. 1, Ex. A.) The bond bound Transamerica as surety, jointly and severally with the principal, Bird Grain, to the United States to:

> Faithfully perform during the period of one year commencing September 23, 1986, or until the termination of [the federal warehouse] license(s) [of Bird Grain] in the event of termination prior to the end of the one year period, all obligations of a licensed warehouseman under the terms of the [Warehouse] Act and regulations thereunder relating to [grain]; and
>
> Faithfully perform during said one year period and thereafter, whether or not said warehouse(s) remain(s) licensed under the Act, such delivery obligations and further obligations as a warehouseman as exist at the beginning of said one year period or are assumed during said period and prior to termination of said license(s) under contracts with the respective depositors of such products in the warehouse(s).

(Doc. 1, Ex. A at 1–2.) Because of the addition of licensed storage space at Bird Grain, which included Section E, Tank 5, and temporary storage bunkers XX and YY, Bird Grain and Transamerica, on April 9, 1987, executed an "Agreement to Increase and Extend Bond," raising the penal sum of the

1986 Warehouseman's Bond to $341,000. (Doc. 1, Ex. B.)

Pursuant to the Warehouse Act and its regulations, Bird Grain purchased from Transamerica on August 17, 1987, Warehouseman's Bond No. 5365 58 30, in the penal sum of $253,000, to take effect September 23, 1987. (Doc. 1, Ex. C.) With the exception of different dates, this bond contains language identical to the 1986 bond quoted above. (Doc. 1, Ex. C at 1–2.) Transamerica concedes in its brief "that at the time this bond was issued, there were outstanding 'delivery obligations' that equaled or exceeded the amount of the bond." (Doc. 66 at 8.) Thus, Transamerica is liable to the United States on this 1987 bond for the sum of $253,000.[1]

Pursuant to the Warehouse Act and its regulations, Transamerica issued on September 23, 1988, an unnumbered Warehouseman's Bond with respect to Bird Grain in the penal sum of $233,000, for the year commencing September 23, 1988. (Doc. 1, Ex. D.) The bond bound Transamerica as surety, jointly and severally with the principal, Bird Grain, to the United States:

[I]f the said license(s) or any amendments thereto be granted and said principal, and its successors and assigns operating said warehouse(s), shall faithfully perform during the period of this bond all obligations of a licensed warehouseman under the terms of the [United States Warehouse Act] and regulations thereunder relating to [grain];

Then this obligation shall be null and void and of no effect, otherwise to remain in full force. For purposes of this bond, the aforesaid obligations under the Act and regulations and contracts include obligations under any and all modifications of [same]. . . .

This [bond] obligation shall be and remain in full force and effect for a minimum of one year beginning with the effective date and shall be considered a continuous bond thereafter until terminated as herein provided. The total liability of the surety is limited to the penal amount hereof, for liabilities that accrue during the term hereof.

(Doc. 1, Ex. D at 1–2.)

Effective July 1, 1983, Bird Grain entered into Uniform Grain Storage Agreement # A46–3–CCC1615J with the Commodity Credit Corporation (CCC), a wholly owned corporation and instrumentality of the United States. (Doc. 1, Ex. E.) This agreement was subsequently amended as of July 1, 1985, July 2, 1985, and July 1, 1986. (*Id.*) Effective April 1, 1988, Bird Grain entered into Uniform Grain Storage Agreement # A46–3–CCC1615K with CCC. (Doc. 1, Ex. F.) Between September 29, 1986, and September 15, 1987, inclusive, Bird Grain received from or for CCC, and issued warehouse receipts to CCC for, 640,283.44 bushels of No. 2 yellow corn. (Doc. 58, Ex. D at ¶ 3.) Between September 24, 1987, and May 23, 1988, inclusive, Bird Grain received from or for CCC, and issued warehouse receipts to CCC for, 163,896.05 bushels of No. 2 yellow corn. (*Id.*) On November 7, 1987, Bird Grain received from or for CCC, and issued a warehouse receipt to CCC for, 14,584 bushels of sample grade corn. (*Id.* & Annex 1 at Receipt 444.) Bird Grain owed an additional storage obligation to CCC for 488.82 bushels of No. 2 yellow corn that were not shipped pursuant to a CCC loading order for 75,488.82 bushels on May 4, 1988. (Doc. 58, Ex. D at ¶ 4.)

On March 30, 1988, a federal warehouse examiner found Bird Grain to be grade deficient in No. 2 yellow corn by at least 6,405 bushels. Upon reconstruction of Bird Grain's records at a subsequent examination on November 15, 1988, federal examiners found Bird Grain to be quantity deficient in corn by at least 475,689 bushels as of September 20, 1988, and quantity deficient in corn by at least 257,229 bushels as of November 15, 1988. On November 18, 1988, the Department of Agriculture suspended Bird Grain's federal warehouse license. (Doc. 69 ¶ 7; Doc. 87 ¶ 7.) On the same date, the South Dakota Public Utilities Commission suspended Bird Grain's grain dealer's license. (*Id.* at ¶ 13; *Id.* at ¶ 13.) As of

---

1. On May 10, 1988, Transamerica issued, with Bird Grain as principal, a $50,000 grain dealer's bond in favor of the State of South Dakota. (Doc. 69 ¶ 11; Doc. 87 ¶ 11.)

December 9, 1988, the corn quantity deficiency was at least 347,167 bushels. In each case, Bird Grain had insufficient quantities of corn on hand to fulfill its obligations under issued warehouse receipts to CCC and other depositors. (Doc. 1, Complaint ¶ 15, Doc. 4, Answer ¶ 2.) As of January 1989, CCC owned 819,252.31 bushels of corn deposited with Bird Grain. (Doc. 58, Ex. "Facts" at ¶ 20; Doc. 68 ¶ 1.) CCC issued two loading orders on January 12, 1989, demanding shipment of this grain from the warehouse. (Doc. 58, Ex. D at 61–66.)

In accordance with the Judgment entered in *Curry v. U.S. Dept. of Agriculture*, CIV 89–4160 (D.S.D.1991) (Doc. 58, Ex. F), CCC, as a valid claimant, received from the proceeds of the liquidation of commodities at the Bird Grain Elevator $784,207.35, which, at $2.068 per bushel (the value realized, net of transportation, advertising, and other merchandising costs, for all corn in the warehouse), is equivalent to 379,210.51 bushels of corn. (Doc. 58, Ex. D at ¶ 7, 9.) Of the 819,252.31 bushels of corn owned by CCC originally deposited at Bird Grain, the warehouse failed to redeliver or pay the value of 440,041.8 bushels. (Doc. 58 Ex. "Facts" at ¶ 22; Doc. 68 at ¶ 1.) The value of the 440,041.8 bushels of yellow corn is $1,096,-412.01. (Doc. 58 "Brief" at 14–15; Doc. 58 "Facts" at ¶ 23; Doc. 68 at ¶ 1.)

The South Dakota Circuit Court, First Judicial Circuit, appointed the South Dakota Public Utilities Commission (PUC) as Receiver of Bird Grain to take possession of any traceable grain proceeds and of the cash proceeds of the $50,000 grain dealer's bond issued by Transamerica as Bird Grain's surety. The state court ordered Transamerica to pay the proceeds of the grain dealer's bond into the receivership, and the PUC, as claims referee, held a hearing to determine who had valid claims to the receivership assets.[2] (Doc. 70, Ex. 2 at 1–3, 6; Doc. 87 at ¶ 14.)

Dennis Bird entered a guilty plea in federal district court to one count of a five-count grand jury indictment. He admitted that between January 1, 1986, and November 14, 1988, he unlawfully converted to his own use corn that was owned by CCC, in violation of 15 U.S.C. § 714m(c). (Doc. 58, Exs. B, C, "Facts" at ¶ 6; Doc. 68 at ¶ 1.)

The government states as undisputed fact that "[t]he United States did not know of a substantial corn shortage at Bird Grain until November 15, 1988." (Doc. 58, "Facts" at ¶ 19.) Transamerica denies this, stating that "[t]he USDA inspector, Jon [sic] Iten knew, or should have known that Bird Grain was short approximately 350,000 bushels of corn." (Doc. 68 at ¶ 1.) As support for this statement, Transamerica cites "Depo. Ex. 1, p. 76." (*Id.*) The cited exhibit, however, is a page taken from the *reconstructed* Daily Position Record completed by a federal warehouse examiner after Bird Grain was subjected to a subsequent examination on November 15, 1988, and the grain shortages were discovered for the first time. (Doc. 71.) The exhibit does not establish as fact that Examiner John Iten knew on August 5, 1988, that Bird Grain was short approximately 350,000 bushels of corn. There is no evidence in this record that Examiner Iten knew of shortages on August 5, 1988. The record in the consolidated *Appley Brothers* case shows that Iten examined Bird Grain's Daily Position Record on August 5, 1988, and it indicated no show-short positions dating back to the April 1, 1988 subsequent examination. (*Appley Brothers* record, Doc. 77, Ex. E at 54; Ex. F at 6.) Thus, Transamerica has failed to create a genuine issue of material fact for trial as to what Examiner Iten knew on August 5, 1988. *See Layton v. United States*, 984 F.2d 1496, 1499 (8th Cir.) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving [parties], there is no genuine issue for trial."), *cert. denied*, 510 U.S. 877, 114 S.Ct. 213, 126 L.Ed.2d 170 (1993).

The Court concludes that the United States is entitled to summary judgment as a matter of law. The Commodity Credit Cor-

---

2. The Court will not address Transamerica's claim that the United States should pay Transamerica the sum of $50,000, which is the amount Transamerica paid out on Bird Grain's state grain dealer's bond. Transamerica has not brought a counterclaim for that amount in this action by the United States to recover on the Warehouseman's Bonds. Transamerica did bring such a claim in the companion tort claims act case.

poration, an agency and instrumentality of the United States, 15 U.S.C. § 714, administers the major federal price support and agricultural commodity programs, and as a consequence, obtains grain from producers. 7 U.S.C. § 1421 *et seq.* Congress has given CCC authority to enter into contracts, or Uniform Grain Storage Agreements (UGSAs), with public warehouses to store this grain. 15 U.S.C. § 714b(h). The UGSA sets out the terms and conditions under which CCC will store grain at the warehouse, and the charges CCC will pay for the storage and other services rendered to it. Bird Grain assumed complete responsibility for maintaining the quality and quantity of the grain it stored for CCC. 1986–87 UGSA §§ 9–10; 1988 UGSA §§ V–VI (Doc. 1 Exs. E, F.) Bird Grain had an obligation to load out promptly to CCC, upon surrender by CCC of appropriate warehouse receipts, commingled grain "of the same quantity and class and of a grade and quality fairly representative of the grain described" in the warehouse receipts. 1986–87 UGSA § 11(d); 1988 UGSA § VII(D). Bird Grain was an insurer and indemnitor for any failure to deliver grain meeting the requirements of the warehouse receipts presented by CCC. 1986–87 UGSA § 13; 1988 UGSA § IX. Bird Grain was required by statute and by the UGSAs to provide bonds in favor of the United States, acting through the CCC, to make up for deficiencies in net worth or other inadequacies in the warehouseman's financial or operational responsibilities. 7 U.S.C. § 247; 1986–87 UGSA § 18(a); 1988 UGSA § XIV(A). To satisfy these prerequisites and federal law, Bird Grain procured Warehouseman's Bonds from Transamerica in the form provided in 7 C.F.R. § 736.13(a). The language utilized by Transamerica in the 1986 and 1987 bonds reflected the federal regulation as it existed prior to October 5, 1987, and the 1988 bond reflected the language used in the amended regulation as in effect on and after October 5, 1987. (Doc. 58 "Brief" at n. 3.)

■ The government correctly contends that Transamerica is liable under all three Warehouseman's Bonds because Dennis Bird's conversion of grain between January 1, 1986, and November 14, 1988, and Bird

Grain's failure to re-deliver upon demand corn owned by CCC is exactly the kind of failure to perform for which the Warehouse Bonds were intended to afford protection. 7 U.S.C. § 258; 7 C.F.R. § 736.48(a); 1986–87 UGSA § 11(a) (Doc. 1, Ex. E); 1988 UGSA § VII (Doc. 1, Ex. F). Any questions concerning liability under a Warehouseman's Bond are governed by federal law. *St. Paul Fire & Marine Ins. Co. v. Commodity Credit Corp.*, 474 F.2d 192, 197 (5th Cir.1973), *appeal after remand*, 646 F.2d 1064 (5th Cir. 1981); *Farmers Elevator Mut. Ins. Co. v. Jewett*, 394 F.2d 896, 899 (10th Cir.1968); *Citizens State Bank of Big Lake v. Transamerica Ins. Co.*, 815 F.Supp. 309, 312 (D.Minn.1993). *See also United States v. McCabe Co.*, 261 F.2d 539, 543–44 (8th Cir. 1959).

The government argues that Dennis Bird's admitted criminal conversion of CCC's grain during the period of January 1, 1986, to November 14, 1988, renders Transamerica liable on all three Warehouseman's Bonds. "A warehouseman who converts to his own use the property deposited with him, or the proceeds thereof, is liable on his bond for such conversion." Appleman, *Insurance Law & Practice*, § 5752 at 549 (1981); *Fidelity & Deposit Co. of Maryland v. State of Montana*, 92 F.2d 693, 695–97 (9th Cir.1937). In response, Transamerica simply argues, without any support, that "USDA has made no claim that Bird Grain did not 'faithfully perform' its obligations between September 23, 1986, and September 23, 1987." (Doc. 67 at 5.) This is not accurate. The government has made a claim that Dennis Bird violated federal law and the provisions of his Warehouseman's Bond by converting grain to his own use between September 23, 1986, and September 22, 1987, the one-year period during which the 1986 bond was in effect, and Dennis Bird admitted as such when he entered his guilty plea. Transamerica's argument must fail.

■ When a warehouseman violates the conditions of his bond during each of three bonding periods, the surety on the bond is liable on all of the bonds for the loss caused by the warehouseman's violations, even if the

loss was not discovered during the bonding periods. *St. Paul Ins. Co. v. Fireman's Fund Am. Ins. Co.,* 309 Minn. 505, 245 N.W.2d 209, 215 (1976) (applying state law, but reasoning is instructive); *Giese v. Engelhardt,* 175 N.W.2d 578, 587 (N.D.1970) (same); *General Ins. Co. of America v. Commodity Credit Corp.,* 430 F.2d 916, 917 (10th Cir.1970) (holding that CCC could collect under prior year bond where shortage began in that year and continued into next bond year). Dennis Bird admitted converting grain during each of the applicable bonding periods, although his malfeasance was not discovered until late 1988. Transamerica is liable on all three bonds on this basis alone.

■ Transamerica also is liable on all three of the bonds because Bird Grain's failure to re-deliver grain to CCC is a violation of the Warehouse Act, 7 U.S.C. § 247; *Jewett,* 394 F.2d at 899–900, as well as a breach of the express terms of the Warehouseman's Bonds and the Uniform Grain Storage Agreements. Even when a warehouse is no longer licensed, a failure to re-deliver grain or pay its value is a violation of federal law because § 247 requires that the Warehouseman's Bond secure performance "of such additional obligations ... as may be assumed by [the warehouseman] under contracts with the respective depositors of agricultural products in such warehouse." *See Stevens v. Farmers Elevator Mut. Ins. Co.,* 197 Kan. 74, 415 P.2d 236, 240 (1966) (construing federal Warehouse Act).

The 1986 and 1987 Warehouseman's Bonds explicitly contemplate coverage to insure Bird Grain's duty to

[f]aithfully perform during said one year period *and thereafter,* whether or not said warehouse(s) remain(s) licensed under the Act, such delivery obligations and further obligations as a warehouseman *as exist at the beginning of said one year period or are assumed during said period* and prior to termination of said license(s) under contracts with the respective depositors of such products in the warehouse(s).

(Doc. 1, Ex. A at 2; Ex. C at 2, emphasis added.) The bonds are a series of separate contracts under which the surety must be liable for defaults occurring in each of the bonding periods.

Transamerica argues that the bonds are ambiguous as written and must be construed against the government because the language used in the bonds parrots the language required by federal regulation, 7 C.F.R. § 736.13. Transamerica urges that the above-quoted clause from the bonds refers only to Bird Grain's "delivery obligations," which it claims are set forth on the warehouse receipt:

Received from: _____. For storage in the above named warehouse ... grain of the quantity, kind and grade described herein for which this receipt is issued ... *said grain is accepted upon the condition that the depositor ... shall demand delivery not later than one year from the date of this receipt.*

(Doc. 67 at 6 & Ex. 1, emphasis in original.) Because all grain deposited by the CCC after September 23, 1986, had a one-year delivery obligation and CCC does not claim that Bird Grain failed to deliver the grain during that one-year period, Transamerica argues the 1986 bond is not available to cover shortages occurring in 1988. It suggests that the phrase "and thereafter" must be read in conjunction with the warehouse receipt and means that "the bond would only apply to deposits received during the twelve months following the issuance of the bond." (Doc. 6 at 6.) As an example, Transamerica suggests that a grain deposit received on September 22, 1987, the last day of the one-year period covered by the 1986 bond, would be covered for one year after the date of deposit. (*Id.* at 7.)

Prior to the promulgation of § 736.13, the Eighth Circuit took the view that the contract of a compensated surety

is construed most strongly against the surety and in favor of the indemnity. Such a contract is to be regarded as in the nature of an insurance contract governed by the rules applicable to insurance contracts and if the bond in suit is fairly open to two constructions or interpretations, one of which would uphold and the other defeat the claim of the insured, that interpreta-

tion or construction which is most favorable to the insured will be adopted. *Massachusetts Bonding & Ins. Co. v. Feutz,* 182 F.2d 752, 756 (8th Cir.1950). The Court need not consider whether the Eighth Circuit would change its view now that the federal government dictates in regulation the wording to be used in a Warehouseman's Bond. As the government correctly argues, no ambiguity exists because each Uniform Grain Storage Agreement states that "[t]he terms of this Agreement, ... shall prevail over the written or printed terms of the warehouse receipts representing the grain[.]" 1986–87 UGSA § 19(a); 1988 UGSA § I.D.1. Transamerica admits that the Warehouseman's Bonds refer to the "further obligations" of the warehouseman, and Bird Grain undisputedly breached its quality and quantity obligations and its obligation to load out grain to CCC upon surrender of warehouse receipts, in violation of the Uniform Grain Storage Agreements. Thus, Transamerica is liable on all three bonds.

■ The government correctly argues that the 1986 and 1987 bonds expressly cover all warehouse receipts written during the year each bond was issued, as well as those warehouse receipts written in a prior year and assumed by the warehouse at the beginning of the next bond year. The warehouse receipts held by CCC were all written or assumed between September 29, 1986, and May 23, 1988, thus within the periods covered by the 1986 and 1987 Warehouseman's Bonds. Transamerica concedes that it is liable under the 1987 bond.

■ Finally, Transamerica claims as a defense to liability on the September 23, 1988 Warehouseman's Bond that Examiner Iten knew or should have known on August 5, 1988, that Bird Grain was substantially short of grain, and that, if Iten had conducted a competent inspection on that date, Bird Grain's license would have been suspended earlier, and Transamerica would not have issued the September 23, 1988 Warehouseman's Bond.

The government argues that any such defense to the bond requires actual knowledge of the facts by the government; an explicit premise of Restatement of Security § 124[3] requires that the creditor (the government) know facts unknown to the surety that materially increase the risk assumed. When Transamerica issued its third Warehouseman's Bond on September 23, 1988, the government did not know of Bird Grain's shortages. Transamerica has not created a genuine issue of material fact on this issue for trial. It is not enough for Transamerica to assert that Examiner Iten should have known of the shortages. The Restatement clearly allows a defense to bond liability only if the surety can establish that the creditor knew certain facts that materially increased the surety's risk and yet the creditor did not share those facts with the surety. *See United States v. Ohio Casualty Ins. Co.,* 399 F.2d 387, 388–89 (6th Cir.1968) (holding that CCC had no duty to disclose to surety for grain elevator that federal Shortage Committee had met where government had no actual knowledge of grain shortages), *cert. denied,* 393 U.S. 1064, 89 S.Ct. 719, 21 L.Ed.2d 708 (1969).

Furthermore, there is no burden on the creditor to investigate for the surety's benefit. Restatement of Security § 124 Comment (b). Transamerica's agent, Carl Anderson,

**3.** This section, Non–Disclosure By Creditor, provides:

(1) Where before the surety has undertaken his obligation the creditor knows facts unknown to the surety that materially increase the risk beyond that which the creditor has reason to believe the surety intends to assume, and the creditor also has reason to believe that these facts are unknown to the surety and has a reasonable opportunity to communicate them to the surety, failure of the creditor to notify the surety of such facts is a defense to the surety.

(2) Where, during the existence of the suretyship relation, the creditor discovers facts unknown to the surety which would give the surety the privilege of terminating his obligation to the creditor as to liability for subsequent defaults, and the creditor has reason to believe these facts are unknown to the surety and has a reasonable opportunity to communicate them to the surety without violation of a confidential duty, the creditor has a duty to notify the surety, and breach of this duty is a defense to the surety except in respect of his liability for defaults which have occurred before such disclosure should have been made.

testified that Transamerica took no specific actions to insure that Bird Grain would faithfully perform under its bonds, never physically examined Bird Grain before issuing the bonds, and never audited Bird Grain. Transamerica relied solely upon financial information compiled by Bird Grain's own Certified Public Accountant. (Doc. 58, Ex. G at 63–64.) The explicit language of the 1988 Uniform Grain Storage Agreement provides: "The CCC warehouse examination under this Agreement is for the use of CCC only and not for the protection of any other party. CCC does not guarantee the results of its examination to the warehouseman or any other party." 1988 UGSA § XIV(C). Transamerica's defense on the 1988 bond must fail.

■■■■ The Court holds that Transamerica is liable for the full penal sum of the three Warehouseman's Bonds in the total amount of $827,000. Prejudgment interest may be awarded beyond the penal amount of the surety bond to compensate the creditor for the loss of the penal sum of the bond on its due date. *Insurance Company of North America v. United States,* 951 F.2d 1244, 1246 (Fed.Cir.1991) (citing *United States v. United States Fidelity & Guar. Co.,* 236 U.S. 512, 530–31, 35 S.Ct. 298, 303–04, 59 L.Ed. 696 (1915)). The government alleges in the complaint at paragraph 22 that

> [b]y letter dated December 2, 1988, CCC advised [Transamerica] of a potential claim against it as surety with respect to Bird Grain. On January 15, 1991, after having been advised that no further assets remained available to satisfy CCC's claim, CCC made demand against [Transamerica] for payment of $1,001,129.02. On January 27, 1992, CCC sent [Transamerica] a supplementary demand letter reducing its demand for payment to the principal amount of $827,000, constituting the aggregate penal sum of [the 1986, 1987, and 1988 bonds], plus applicable interest.

The complaint further alleges that by letter dated January 25, 1992, Transamerica denied liability. In its reply brief, the government reiterates its request for prejudgment interest, but does not provide authority for an interest award accruing as of January 15, 1991, or give authority for the proper interest rate to be imposed. (Doc. 86 at 15.) Transamerica does not address the subject in its brief.

In *United States v. Employers Mut. Casualty Co.,* 226 F.2d 895, 900 (8th Cir.1955), the Eighth Circuit held that a surety could be required to pay prejudgment interest on the penal sum of a Warehouseman's Bond from the date of the warehouseman's default. The court reversed and remanded for imposition of the interest award at the annual rate of five percent from the date of default. *Id.* The opinion does not explain how the five percent figure was reached.

Bird Grain's defaults in this case actually occurred when Dennis Bird converted grain and when CCC issued loading orders for redelivery of its grain stored in the elevator and Bird Grain failed to re-deliver. The record does not show when Dennis Bird actually sold grain that belonged to CCC. The record does show that CCC issued two loading orders on January 2, 1989, in an attempt to retrieve all of its grain from the elevator, but the record does not indicate the actual date Bird Grain failed to re-deliver. The government alleges in the complaint that it was advised on January 15, 1991, over two years later, that there were no assets remaining to satisfy CCC's claim, and at that time, CCC made demand upon the surety. The government seeks interest only from this date. Considering that the government does not ask for interest as of the warehouseman's defaults, the Court finds that prejudgment interest can be awarded from January 15, 1991, consistent with *Employers Mut. Casualty Co.,* 226 F.2d at 900. Such an award is also consistent with the Federal Circuit's approach that a surety owes interest from the time a creditor properly demands payment under the bond. *Insurance Company of North America,* 951 F.2d at 1247.

■■■ The Warehouseman's Bonds do not specify a rate of interest, and the government has not cited an applicable interest provision. The Court has been unable to locate a federal prejudgment interest rate applicable to this action. Under state law, if the contract at issue does not specify an

interest rate, interest is imposed at the Category B rate. S.D.Codified Laws Ann. § 21–1–13.1 (Supp.1995); S.D. Codified Laws Ann. § 54–3–16 (Supp.1995); *U.S. Lumber, Inc. v. Fisher*, 523 N.W.2d 87, 90–91 (S.D.1994). Between January 15, 1991, and July 1, 1994, the Category B rate of interest was twelve percent per year under § 54–3–16. From July 1, 1994, to the present, the Category B rate is ten percent per year. The Court will impose these twelve and ten percent rates from January 15, 1991, to the date of Judgment. Prejudgment interest is awarded to the United States under state law at the Category B rate of twelve percent per year from January 15, 1991, to June 30, 1994, in the amount of $343,397.07, and at the Category B rate of ten percent per year from July 1, 1994, to the date of Judgment, in the amount of $147,503.58, for a total sum of $490,900.65.

The government is also entitled to post-judgment interest until the Judgment is paid under 28 U.S.C. § 1961, with postjudgment interest to be calculated as provided in that statute. The government is entitled to costs under 28 U.S.C. §§ 1920 and 2412, in an amount to be determined by the Clerk. Accordingly,

IT IS ORDERED:

(1) that the United States' Motion For Summary Judgment is granted. (Doc. 58.)

(2) that Transamerica Insurance Company's Motion for Summary Judgment is denied. (Doc. 66.)

(3) that Judgment is entered in favor of the United States and against Transamerica Insurance Company on Warehouseman's Bond No. 5365 58 30, in the penal sum of $341,000 effective September 23, 1986, and April 9, 1987; on Warehouseman's Bond No. 5365 58 30, in the penal sum of $253,000, effective September 23, 1987; and on an unnumbered Warehouseman's Bond in the penal sum of $233,000, effective September 23, 1988, in the total amount of $827,000.

(4) that prejudgment interest is awarded to the United States under state law at the Category B rate of twelve percent per year from January 15, 1991, to June 30, 1994, in the amount of $343,397.07, and at the Cate-

gory B rate of ten percent per year from July 1, 1994, to the date of this Judgment, in the amount of $147,503.58, for a total sum of $490,900.65.

(5) that the United States is entitled to postjudgment interest under 28 U.S.C. § 1961 until the Judgment is paid, with postjudgment interest to be calculated as provided in that statute.

(6) that the United States is entitled to costs under 28 U.S.C. §§ 1920 and 2412, in an amount to be determined and inserted in the Judgment by the Clerk.