UNITED STATES of America, Plaintiff,

v.

INTERNATIONAL FIDELITY INSUR-ANCE COMPANY, and Howard W. McDaniel, Defendants,

and

INTERNATIONAL FIDELITY INSURANCE COMPANY, Third–Party Plaintiff,

v.

Katherine T. McDANIEL, Third–Party Defendant.

No. 95–1169–WEB.

United States District Court, D. Kansas.

Jan. 29, 1998.

Richard L. Schodorf, Office of U.S. Attorney, Wichita, KS, for U.S.

Thomas J. Koehler, Lawrence Lerner, Levy & Craig, P.C., Kansas City, MO, for International Fidelity Ins. Co.

Howard W. McDaniel, Geuda Springs, KS, pro se.

Katherine T. McDaniel, Geuda Springs, KS, pro se.

## MEMORANDUM AND ORDER

WESLEY E. BROWN, Senior District Judge.

In April, 1995, this action was brought by the United States against defendant International Fidelity Insurance Company (hereafter "IFIC") on behalf of the Commodity Credit Corporation, (CCC) to recover on a warehouseman's bond written in 1987 by IFIC to insure a grain storage agreement between Howard W. McDaniel and the CCC involving storage facilities located in Gueda Springs, Kansas. In the complaint, it was alleged that Mr. McDaniel breached his obligations under the storage agreement and was indebted to the United States for the sum of $111,-904 plus interest.

The United States joined Howard W. McDaniel as a party defendant, IFIC filed a cross claim against Howard McDaniel, and a third-party complaint against his wife, Katherine McDaniel. Katherine McDaniel in turn filed a claim against IFIC alleging that it had no right to take money "from the McDaniel savings account at Wellington, Ks" which she owned. The claims of IFIC against the McDaniel defendants are based upon indemnity agreements which they signed in connection with IFIC's undertaking on the warehouseman's bond.

Following a mediation session in October, 1996, which all parties attended, the United States and IFIC agreed to settle the claim of the United States against IFIC on the warehouseman's bond for the sum of $40,000. On December 2, 1996, IFIC entered into a Settlement Agreement with the United States to settle the government's claim.

Due to an ongoing dispute by the McDaniel defendants concerning the merits of the government closing of the McDaniel warehouse, and their allegations that they were

entitled to a return of collateral pledged in connection with their indemnity agreements, no agreement was ever reached on the IFIC cross claim and third-party claim involving the McDaniels.

On August 18, 1997, the court entered an order sustaining the motion of the United States to dismiss its claim against Howard McDaniel without prejudice and sustained the motion of IFIC for leave to file a motion for summary judgment upon its cross claim against Howard McDaniel and to renew it motion for summary judgment upon the third-party claim of Katherine McDaniel. (Dkt.72).

On September 9, 1997, a stipulation was filed in this case dismissing the complaint of the United States against IFIC, with prejudice, pursuant to the Settlement Agreement previously entered in to by these parties. (Dkt. 73, *and see, infra*).

A final pretrial conference was held in open court on September 15, 1997. Attending were defendant IFIC, defendant Howard W. McDaniel, and third-party defendant Katherine T. McDaniel—the McDaniel defendants appearing *pro se*.[1] At this time IFIC presented a proposed pretrial order, with Exhibits A through V attached, and Howard and Katherine McDaniel submitted documents now referred to as McDaniel Exhibits 1 through 5.[2]

On November 20, 1997, the court entered a final pretrial order incorporating these exhibits. (Dkt.85)[3] A motion filed December 12, 1997, by the McDaniel defendants to "correct or amend" the final pretrial order has been denied. (Dkt.# 92, 93)[4]

### Findings of Material Fact

The court now turns to the motion of IFIC for summary judgment against Howard W. McDaniel, and its renewed motion for summary judgment against Katherine T. McDaniel. After reviewing the exhibits presented in support of said motions, the court determines that IFIC is entitled under the Agreement of Indemnity and Collateral Agreements to settle with the United States and to deduct from the collateral it holds under those agreements the settlement amount and its attorneys fees and expenses. This is the only issue remaining in the case. Under these circumstances, the motions for summary judgment will be sustained.

The court finds the following facts to be without material dispute:

On July 1, 1983, Howard McDaniel and the United States Department of Agriculture

---

1. Although the plaintiffs, United States of America and IFIC, had filed a stipulation dismissing the complaint of the United States against IFIC, at the request of the Court a representative of the United States appeared at this pretrial conference.

2. Ex. 1 was entitled "Object to the Subject Matter Jurisdiction To the Court—ISSUE # 1";

Ex. 2 was entitled "Issue # 2—It has never been proven that there was a quality problem with McDaniel grain.";

Ex. 3 was "Issue # 3—Our bond had expired and IFIC could not seize our personal funds to satisfy an expired bond."

Ex. 4 was a document entitled "To the Court," signed by Katherine McDaniel, in which she contends that her money was wrongfully taken from a savings account, that the CCC "has no claim on the cash bond," that CCC violated the grain storage agreement by failing to give Howard McDaniel a hearing; and that "at the mediation it was found that there was no shortage of grain."

Ex. 5 was a copy of a letter dated December 4, 1990, from Attorney Thomas Schwinn, addressed to IFIC, apparently then representing Howard McDaniel, setting out *possible* defenses to the claims of the Commodity Credit Corporation.

3. In addition to the 5 documents described above, an additional document, entitled "Counterclaim" with attachments, was filed at the pretrial hearing on September 15 by the McDaniels. This document, alleging "damages" of $182,-957.78, involves claims by McDaniel Grain Co. against the Commodity Credit Corporation on account of "loadout" and storage charges on third-party accounts dating back to 1988 and 1989. At the time this document was filed, the United States was no longer a party to this action, and such "Counterclaim" is not now relevant to the case.

The court would also note that similar issues were raised by McDaniel and decided adversely to him by the USDA Contracting Officer in a decision rendered on September 23, 1992, discussed *infra*.

4. In this belated motion, the McDaniels attempted to add entirely new theories to this case, including an argument that the United States on behalf of the Commodity Credit Corporation, did not own the grain in question.

(USDA) entered into a Uniform Grain Storage Agreement (UGSA).

On August 14, 1986, in connection with this business, Howard McDaniel, d/b/a McDaniel Grain Company, designated as "contractor," Howard W. McDaniel, individually, and Katherine McDaniel, designated as "indemnitors" entered into Agreements of Indemnity with IFIC, as surety and bonding company for the McDaniel Grain Company. (Exhibit A).

The pertinent parts of the Indemnity Agreements are as follows:

The Contractor and Indemnitors shall exonerate, indemnify and keep indemnified the Surety from and against any and all liability for losses and/or expenses of whatsoever kind or nature (including, but not limited to, interest, court costs and counsel fees) and from and against any and all such losses and/or expenses which the Surety may sustain and incur: (1) By Reason of having executed or procured the execution of the Bonds, (2) By reason of the failure of the Contractor or Indemnitors to perform or comply with the covenants and conditions of this Agreement.... Payment by reason of the aforesaid causes shall be made to the Surety by the Contractor and Indemnitors as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor ... In the event of any payment by the Surety the Contractor and Indemnitors further agree that in any accounting between the Surety and the Contractor, or between the Surety and the Indemnitors, or either or both of them, *the Surety shall be entitled to charge for any and all disbursements made* by it *in good faith* in and about the matters herein contemplated by this Agreement *under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements* whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by the Surety shall be prima facie evidence of the fact and amount of the liability to the Surety. (Exhibit A) (Emphasis supplied)

Paragraph Thirteen of the Indemnity Agreement contains provisions for settlement of claims made against the bond:

*The Surety shall have the right to adjust, settle or compromise any claim, demand, suit or judgment upon the Bonds, unless the Contractor and the Indemnitors shall request the Surety to litigate such claim or demand,* or to defend such suit, or to appeal from such judgment, *and shall deposit with the surety, at the time of each request, cash or collateral satisfactory to the Surety in kind and amount, to be used in paying any judgment or judgments rendered or that may be rendered, with interest, costs, expenses and attorneys' fees, including those of the Surety.* (Ex. A) (Emphasis supplied)

On November 26, Howard McDaniel entered into a Collateral Agreement with IFIC, pledging two certificates of deposit, both of which were in the name of Howard McDaniel. The certificates, both dated October 16, 1986, included one for $24,000 was with the Union State Bank of Arkansas City, and one for $52,000 with the First Federal Savings Bank in Wellington, Kansas. (Exhibit B)

On January 21, 1987, Howard McDaniel entered into a Collateral Agreement with IFIC, pledging a certificate of deposit in the name of Howard McDaniel, dated 1/1/87, for $76,000 with the Union State Bank of Arkansas City, Kansas. (Exhibit C)

On October 10, 1987, IFIC issued a Warehouseman's Bond in the total penal sum of $152,000 on behalf of Howard McDaniel d/b/a McDaniel Grain Company, to the United States as Obligee. (Exhibit D). Howard McDaniel signed this Bond and agreed that the Bond was given in order:

... to secure the faithful performance of his obligations as a warehouseman under the terms of the said United States Warehouse Act and the regulations prescribed thereunder and of such additional obligations as a warehouseman as may be assumed by him under contracts with the respective depositors ..."

The terms of the Warehouseman's Bond required Howard McDaniel, d/b/a McDaniel Grain Co. to:

Faithfully perform during the period of one year commencing October 10, 1987 ... all obligations of a licensed warehouseman under the terms of the Act and regulations thereunder relating to the above-named products; and ...

Faithfully perform during said one year period *and thereafter,* whether or not said warehouse(s) remain(s) licensed under the Act, such delivery obligations and *further obligations as a warehouseman as exist at the beginning of said one year period or are assumed during said period* and prior to termination of said license(s) under contracts with the respective depositors of such products in the warehouse(s). (Emphasis supplied) (See Exhibit D)

*On June 8, 1988,* the USDA conducted a warehouse inspection which revealed that McDaniel's warehouse was in "... out-of-grade wheat and grain sorghum, rats in several sections and bins, raccoon excretion on top of grain, dead birds, weevil and bran bugs in bins, and the possibility of collapsed aeration tubes in the flat storage. The only CCC owned grain instore was wheat." (Ex. E, N)

*On June 23, 1988,* McDaniel's license was temporarily suspended by the United States pending investigation of "out of condition" wheat and determination of financial condition. (Ex. F)

*On June 28, 1988,* the United States Department of Agriculture formally notified McDaniel by certified letter of serious violations and the suspension of his warehouse license, issuance of load out orders and termination of his Grain Storage Agreement (UGSA) subject to appeal, stating in part "[y]ou are also out of position in quality on wheat." (Ex. G). It was noted that "You are covering 16,226 bushels of No. 1HW; 128,051 bushels of No. 2HW; and 151,117 bushels of No. 3HW for a total of 295,394 bushels with sample grade wheat." McDaniel was advised Section 7A of the UGSA required him to maintain enough grain in store to cover his storage obligations by quantity and quality to Commodity Credit Corporation *and to all others:*

The warehouseman must maintain at all times in the warehouse shown on the warehouse receipts and in which such grain was originally deposited, a stock of grain equivalent at least to the quantity, class, and grade, and fairly representative of the quality which the warehouseman is obligated to deliver to all depositors and the holders of warehouse receipts.

On September 27, 1988, an independent inspector, the Enid Grain Inspection company, published the results of its testing of McDaniel Grain Company's grain, reporting that eleven of sixteen samples tested only at sample grade. It was also noted that nine of these samples were either "musty," "sour," or "insect damaged," one also being contaminated with "animal filth." These wheat samples were submitted to the Enid Grain Inspection Company by McDaniel himself. (Ex. H, and see Ex. I.)

On May 9, 1989, McDaniel was notified by certified letter that the government office had received a complaint from a third party concerning the condition of wheat purchased from McDaniel:

Our office received a telephone call from Mr. Wayman Neilsen of Producers Market, Inc. on May 31, 1988 stating the wheat they had purchased from Commodity Credit Corporation (CCC) in your warehouse was low quality with a high count of insect damaged kernels (IDK). He reported there were dead rats and raccoons on the grain surface and some of the aeration tubes were collapsed." (Ex. I)

McDaniel was also advised of shortages found on other examinations:

Another examination was made on November 28, 1988 and a measured shortage of 19,083 bushels of wheat was determined. The Sumner County Attorney placed a restraining order against your warehouse on December 14, 1988 for operating a warehouse without a Kansas state license. This order prevented you from receiving any additional grain, and you were to either buy the grain stored in your warehouse or redeliver to the owners. You told ... [our agent] that you would purchase all CCC inventory within one month.

We made another examination on April 17, 1989, at your request, and we measured the wheat inventory 23,586 bushels or 18 percent short of obligations. This was an additional shortage after adjustment for the 19,083 bushels measured short in November 1988. (Ex. I)

At this time McDaniel was advised that all grain was to be sold to third parties, and after loading orders were settled, he would be billed for the difference in the quality and quantity of grain in storage. (Ex. I).

On August 29, 1989, McDaniel notified IFIC that if any claim was made against the bond and the three certificates of deposits pledged as collateral, claims should first be paid from the First Federal Savings and Loan certificates and then from the Union State Bank certificates described above. Any residual remaining from the pledged collateral was to be returned "and made payable jointly to Howard M. McDaniel and The Union State Bank." If no claims were made on the bond, then the certificates were to be returned intact to the Union State Bank. (Ex. J)

On June 27, 1988, the Commodity Office had notified IFIC of a potential claim against the McDaniel Grain Company. On October 18, 1990, the agency made a formal demand upon IFIC, advising that final settlements and calculations were completed in December, 1989, showing that $110,980.85 was due the Commodity Credit Corporation at that time. Interest had been accruing on that sum since January 25, 1990, resulting in a total of $121,534.67 due as of October 18, 1990. IFIC was further advised that all attempts to settle the matter with McDaniel, "and a series of attorneys representing him," had been unsuccessful. (Ex. M)[5]

Howard McDaniel continued to insist that the loading order settlements were not accurate and that he was entitled to various storage credits and off-sets against the claim of the CCC. A contracting officer rendered a formal decision on McDaniel's contentions on September 23, 1992, (Ex. N). This decision did reduce the amount of the CCC claim but determined that, due to breaches of the UGSA, a revised balance was still due the CCC from McDaniel in the amount of $111,

904.90.[6] In this decision, McDaniel was advised that he had the right to make a written appeal from the decision to the United States Department of Agriculture Board of Contract Appeals in Washington, D.C., within 90 days from his receipt of the decision. Again, a formal demand was made upon McDaniel for the sum of $111,904.90, with interest accruing from the date of the final decision. McDaniel was advised that his surety was also being notified of the decision and of the continued demand for payment. (Ex. N)

On October 27, 1992, IFIC acknowledged receipt of the formal claim rendered by the contracting officer. (Ex. O)

On December 31, 1992, IFIC offered to tender its defense of the claim of the United States against the Bond to Howard McDaniel's then attorney, John Roper. (Ex. P)

On March 9, 1993, there being no acceptance of the defense, IFIC advised Attorney Roper to accept the tender of defense, or that IFIC "will hold the individual indemnitors of McDaniel Grain Company solely responsible for any disbursements (IFIC) has to make on their behalf." Roper was further advised that if there was no response to the offer of defense within five days, the claim of the United States would be resolved as IFIC should deem appropriate. (Ex. Q)

On March 24, 1993, Attorney Roper advised IFIC that he could not represent McDaniel "without his cooperation," that he had nothing in writing from McDaniel asking him to cease representing him, but he would not pay Roper; he had not given Roper the key evidence to support his claim for damaged wheat (i.e., the wheat allegedly removed from his warehouse which was destroyed by moisture). With reference to an appeal of the adverse decision of the contracting officer, Roper had this comment: (Ex. R)

> You indicated that you got a copy of [McDaniel's] recent letter to the appeals

---

[5]. On February 1, 1990, attorney Christopher Rogers advised IFIC that he had been retained by Howard McDaniel to represent him in the Commodity Credit matter and that IFIC was not to disburse any funds without further direction.

On September 18, 1990, Attorney Rogers advised the Commodity office that he no longer represented McDaniel, stating that ."I spoke with the McDaniels, and they were to provide me with the amount, if any, which they feel is owed and

the figures upon which that amount is based. They have not yet furnished me with those figures and have decided to either undertake your claim on their own or with other counsel." (Ex. K, L)

[6]. The formal decision found that McDaniel's claims for additional storage charges and other adjustments for fumigation charges, etc., were without merit.

people in Washington. Howard has it in his head that I should have made this appeal within 90 days from the Final Decision Letter of the CCC. This is quite contrary to my clear recollection. As I recall it, we specifically discussed this 90 day option shortly after I got into the case and agreed not to appeal to the folks in Washington but to proceed with the negotiations with CCC in the Kansas City Office and then to Federal District Court in Wichita if the matter could not be settled.

On April 7, 1993, IFIC advised the Union State Bank in Arkansas City that its total exposure could not be determined until the United States released IFIC from its obligations under the bonds issued on behalf of McDaniel Grain Company. Upon such release, any surplus remaining from the certificates of deposit would be remitted to the bank. (Ex. S)

■ On May 5, 1993, the CCC filed a motion to dismiss McDaniel's appeal of the adverse decision of the contracting officer on the ground that the appeal was filed out of time.[7] (Ex. T).

On July 19, 1993, the Board of Contract Appeals, United States Department of Agriculture, sustained the government's motion to dismiss McDaniel's appeal from the decision of the contracting officer, for lack of jurisdiction. The Board noted that "timeliness is jurisdictional, and that neither a CO nor this Board has the authority to waive the statutory 90–day filing period." (Ex. U).

By March 22, 1994, McDaniel had retained yet another attorney to look into his claims

against the CCC. On that date, Attorney Karen McIlvain advised the CCC Kansas City office to the following effect: (Ex. V)

As you are aware, I agreed on behalf of Mr. McDaniel to review his situation regarding CCC. I have reviewed his situation and advised him that I do not believe the facts, as I understand them, allow me to make a claim on his behalf or in his defense against CCC in this matter.

On February 7, 1995, a final demand for payment of $111,904.90 and interest was made upon IFIC by counsel for the Department of Agriculture. (Ex. W). On March 6, 1995, IFIC advised USDA counsel that it believed that the claim of the government was barred by the statute of limitations. (Ex. X)[8]

On April 10, 1995, the complaint in this case was filed by the United States against IFIC on the Warehouseman's Bond. (Dkt.1)

On September 7, 1995, IFIC filed a motion for summary judgment based upon the statute of limitations defense. (Dkt.9). On February 12, 1996, the IFIC motion for summary judgment was denied.

In July, 1996, the United States offered to settle its claim on the bond for the sum of $75,000; but withdrew the offer and refused to negotiate further unless McDaniel retained an attorney who would "stay with the case." On July 22, 1996, IFIC advised McDaniel that if the case was not settled, additional defense expenses would become necessary and IFIC would file claims against McDaniel and his wife as indemnitors, which could expose them to liability over and beyond what they had pledged as collateral. (Ex. Y)[9]

---

7. 41 U.S.C. § 606, Contract Disputes Act, requires an appeal to be filed within 90 days of receipt of the contracting officer's decision. That requirement is jurisdictional and is strictly construed. *Cosmic Const. Co. v. United States*, 697 F.2d 1389 (Fed.Cir.1982). The contracting officer's decision was dated September 23, 1992, but the appeal was not filed until March 16, 1993.

8. The United States alleged that the cause of action arose in June, 1988, while McDaniel claimed that the loss occurred in 1985. In this respect, IFIC claimed that the Kansas five-year statute of limitations applied, thus barring any recovery against the McDaniel Grain Company. (Ex. X)

9. In the correspondence of July 22, IFIC contradicted McDaniel's belief that he was entitled to receive back the collateral he had pledged and his contention that attorneys' fees should not be deducted because the CCC claim is improper. He also alleged that the indemnity agreement he signed did not apply to this bond.

In this correspondence, IFIC also requested that McDaniel supply a list of witnesses to support his claims and that arrangements be made for IFIC counsel to review documents in his possession which could be used in defense of the claim of the United States.

A mediation session was arranged to be held on this case October 16, 1996.[10] In preparation for this, representatives of IFIC travelled to Geuda Springs on October 10, 1996, to inspect the warehouse premises and to review documents allegedly in the possession of McDaniel. When they arrived, McDaniel refused to let IFIC review his documents upon the advice of his newly retained counsel, William Vickery. (Ex. Z).

The mediation session was held in Wichita, Kansas, on October 16, 1996. Attending were the United States, the McDaniels, McDaniel's attorney William Vickery, the mediator Paul Thomas, and a consulting mediator, a "Kansas Grain expert", Gerald L. Schweitzer. At this time the United States agreed to reduce its claim to $40,000 if IFIC would settle the case. IFIC agreed to settle, pending negotiations with the McDaniels concerning expenses and fees incurred in connection with the defense of the case. (Ex. AA). McDaniel remained adamant that he was without fault in the operation of his grain storage business.

On October 22, 1996, IFIC advised the McDaniels that the claim of the United States, with interest through the end of 1996, was approximately $212,000, and that the expenses of IFIC including attorney fees would amount to about $49,000 by that date. In view of the fact that the certificates of deposit pledged to guarantee the indemnity agreements totalled only $150,991.85, potential losses to IFIC might approach $110,000 beyond the amount of collateral deposited. At that time, the McDaniels were advised by IFIC that unless the McDaniels pledged additional collateral, IFIC intended to settle the claim made by the United States for the sum of $40,000. (Ex. BB).[11]

In response to this correspondence, in October, 1996, Howard McDaniel filed a pleading entitled "Facts by Exhibits," which included his unsubstantiated and/or meritless claims that government computations on quality or quantity in grain stored were erroneous, an allegation that a third party "manufactured wheat samples" in order to get out of a contract, that "off-grade wheat was a manufactured story and condition made in Kansas City CCC office," that no claim was made on the warehouse bond until after it expired, and claims regarding "an alleged embezzlement" of $26,000 in a savings account (entirely unrelated to the bond claim). (Ex. CC)

After reviewing these allegations, IFIC explained to McDaniel that none had merit, and none would substantially affect the overall settlement with the government. On November 21, 1996, IFIC advised the McDaniels that the additional collateral requested in the letter of October 22 had not been provided, and they had breached the Agreements of Indemnity. Under these circumstances, the McDaniels were told that IFIC would proceed to mitigate the damages and settle with the government for the agreed sum of $40,000. (Ex. CC)

On December 2, 1996, IFIC entered into the Settlement Agreement with the United States, agreeing to pay the sum of $40,000 in satisfaction of its responsibilities under the Bond. (Ex. DD).

On January 8, 1997, Howard McDaniel advised IFIC that he objected "to any settlement using my funds to be paid to the CCC," and he "demanded immediate return" of the certificates of deposit, with interest. At this time, McDaniel erroneously seemed to believe that he had been "removed from the suit" and stated he would not be bound by anything which has occurred in the suit, "including the settlement." He continued to deny that he owed any debt to the CCC which was covered by the bond, and he again asserted that the statute of limitations barred any CCC claim against him. (Ex. EE)

On January 30, 1997, IFIC again advised McDaniel that his allegations were without merit and enclosed a written summary of

---

**10.** McDaniel had continually complained that he had never had a "hearing" on his allegations concerning the CCC. Apparently the mediation session was arranged for this reason.

**11.** The United States claimed a quantity shortage amounting to $118,442.87; a quality deficiency

at loadout for $53,542.73 (which already included a credit for insect damaged kernels and a credit for warehouse charges of $61,004.75). The claim, with interest through the end of 1996 totalled about $212,000. (Ex. BB)

events in the case. In addition, it was pointed out that while McDaniel continued to deny his responsibilities under the warehouse bond and indemnity agreements, additional costs and fees were accruing as charges against the collateral he had pledged. (Ex. FF) [12]

A true and correct accounting of all attorneys' fees and expenses incurred by IFIC in connection with the claim of the United States appears as Exhibits GG, HH, the "Collateral Report Summary," a part of the IFIC motions for summary judgment. The deductions for fees and expenses including the settlement payment to the government amount to $116,905.95, leaving an approximate balance of $34,085.90 to be returned to Howard McDaniel and the Union State Bank as joint payees. (Ex. GG).[13]

### Conclusions of Law

**A. McDaniel's Breach of the Uniform Grain Storage Agreements**

The documents discussed above speak for themselves, and the court believes that the above stated facts are essentially uncontroverted. A motion for summary judgment may be granted when there is no issue of material fact remaining for trial, and the moving party is entitled to judgment as a matter of law. Rule 56(c), Federal Rules of Civil Procedure.

■ There can be no doubt that Howard McDaniel entered into the Uniform Grain Storage Agreement, he undertook the responsibilities of a warehouseman as described in the bond and indemnity agreements which he and his wife signed, and that he agreed to the terms of the collateral agreements which he executed to secure his

bond and indemnity arrangements with IFIC. While McDaniel continues to deny that there were deficiencies in both quality and quantity of the grain stored in his facility, the undisputed facts are to the contrary. In the first instance, we have the factual findings of the contracting officer in September, 1992, to the effect that McDaniel did breach his storage agreement, and that there were such deficiencies that he became indebted to the government in the sum of $111,904.90, with interest from the date of that decision. Those findings, which were not timely appealed, became the final judgment of the Department of Agriculture upon the nature and effect of the breach of contract.

In addition to these administrative findings, the documents which have been submitted by IFIC in support of its motions amply reinforce the validity of the agency ruling. In a recent grain bond case, *Appley Bros. v. U.S.*, 924 F.Supp. 935 (D.S.D.1996), affirmed 107 F.3d 876 (8th Cir.1997), the court found that the United States was entitled to summary judgment upon a finding that the bonding company was liable on grain bonds issued in the years 1986 through 1988 for a total judgment of $827,000 plus $490,900 in interest, plus costs to be determined. In the *Appley* case, which involved a Uniform Grain Storage Agreement similar to McDaniel's contract, the court discussed the nature of the obligations undertaken by the storage operator:

> The Commodity Credit Corporation, an agency and instrumentality of the United States, 15 U.S.C. § 714, administers the major federal price support and agricultur-

---

**12.** In this letter IFIC specifically pointed out the accruing nature of costs and fees:

> Certainly as of this date the balance that may get returned to you will not be as large as the balance that would have been returned to you if you had resolved this matter many many months ago or had reasonably settled at the Mediation. As you know you are no longer represented by the attorney that represented you at the Mediation and despite any recommendations he may have made to you including those by the Mediator and the outside independent grain warehouse consultant, Mr. Schweitzer, you have continued to fight and deny all liability to the Government in this matter without providing any credible evi-

dence, documents or exhibits and to demand that IFIC return all your money despite the Agreements you signed to induce IFIC to provide your Bond. Your continued fight requires us to expend further attorney's fees and further depletes the collateral funds in the manner. (EX.FF)

**13.** This sum includes $5,000 which has been included in the total fee amount as estimated future fees which may accrue before the case is finally closed in this court. The actual fee amount could be less to the extent that future fees are less than $5,000. Affidavit of Lawrence Lerner, Attorney for IFIC, Ex. HH.

al commodity programs, and as a consequence, obtains grain from producers. 7 U.S.C. § 1421 et seq. Congress has given CCC authority to enter into contracts, or Uniform Grain Storage Agreements ... with public warehouses to store this grain. 15 U.S.C. § 714b(h). The UGSA sets out the terms and conditions under which CCC will store grain at the warehouse, and the charges CCC will pay for the storage and other services rendered to it. *Bird Grain assumed complete responsibility for maintaining the quality and quantity of the grain it stored for CCC.* Bird Grain had an obligation to load out promptly to CCC, upon surrender by CCC of appropriate warehouse receipts commingled grain "of the same quantity and class and of a grade and quality fairly representative of the grain described" in the warehouse receipts.... *Bird Grain was an insurer and indemnitor for any failure to deliver grain meeting the requirements of the warehouse receipts presented by CCC*.... (Emphasis supplied) 924 F.Supp. at 939–940.

B. *IFIC's Right to Settle and to Deduct Expenses from Collateral*

■ With reference to the question of the right of IFIC to settle the claim of the United States, to rely upon the indemnity agreements signed by Howard and Katherine McDaniel, and to deduct all of its expenses from the collateral it holds to secure its right of indemnity, the court must conclude that, again, the documents discussed above speak for themselves.

In the first instance, and contrary to McDaniel's contentions, the bond in question covered the claim of the United States for the one-year period commencing October 10, 1987, *"and thereafter"* as to any obligations as they existed at the beginning of that one-year period.

Paragraph Thirteen of the Indemnity Agreement provided that IFIC had the right to compromise any claim made upon the bond unless the indemnitors requested litigation and deposited collateral to pay any judgment, expenses and attorneys' fees which might accrue. The McDaniels failed to deposit additional collateral to cover such costs.

Under the terms of the indemnity agreements, IFIC is entitled "to charge for any

and all disbursements made by it in good faith in and about the matters ... [contemplated by the agreement] under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expedience existed."

The court further concludes that the expenditures for fees and expenses expended by IFIC, as described in Exhibits GG and HH were made in good faith and conformed to the specifications of the indemnity agreement described above.

The court concludes that Katherine McDaniel has failed to offer any evidence in support of her claim that IFIC wrongfully seized her money from a bank account in Wellington, Kansas, or that she is entitled to its return. In the first instance, all of the evidence is to the effect that the certificates of deposit pledged by Howard McDaniel were in his name only. In the second place, it has been established that Katherine McDaniel was a co-signer of the indemnity agreement in question and that her obligations under that agreement are co-existent with those of Howard McDaniel. Finally the evidence establishes that any surplus remaining from the certificates of deposit is to be returned only to the Union State Bank and Howard McDaniel, as co-payees.

*Conclusion*

The court concludes that IFIC has abundantly demonstrated that there is a complete absence of evidence to support the allegations of the McDaniels. For the reasons discussed above, the court determines that the motions for summary judgment be sustained, International Fidelity Insurance Company was authorized to settle the claim with the United States and to deduct the settlement amount and attorneys' fees and expenses shown in its accounting. As has previously been agreed, any balance remaining from the proceeds of the certificates of deposit is to be remitted by IFIC to Howard McDaniel and the Union State Bank, as joint payees. Accordingly,

IT IS ORDERED that the motion for summary judgment of International Fidelity Insurance Company against Howard W.

McDaniel and its renewed motion for summary judgment against Katherine T. McDaniel, be, and they are hereby SUSTAINED.